IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **DISTRIBUTED LEDGER, INC** | * |
| **Plaintiff,** | * |
| v. | *  CASE NO.: 1:21-cv-490-KD-N |
| **NEW GREEN NETWORK LLC, MILWAUKEE SEO LLC, and SCOTT OFFORD** | * |
| | * |
| | * |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff, Distributed Ledger, Inc. (hereafter "DLI"), respectfully submits the following memorandum of law in support of its motion for a temporary restraining order ("TRO") and for a preliminary injunction against defendants, New Green Network, LLC ("NGN"), Milwaukee SEO, LLC ("Milwaukee SEO") and Scott Offord ("Offord").[1] Defendants, NGN, Offord and Milwaukee SEO are and were the alter ego of the other and conspired to commit the acts complained of.

**Introduction**

Plaintiff, DLI, is in the business of selling and servicing equipment used in the mining of cryptocurrency. In or around early December, 2020, Plaintiff purchased from defendant, New Green Network, LLC ("NGN"), the majority, if not all, of its assets including, without limitation,

---

[1] Defendant's counsel was provided a copy of the Complaint and will be provided a copy of this motion and memorandum upon filing.

the brand, domain, website, apps and code base for "cryptomining.tools.com". DLI also acquired NGN's customer base, user list and multiple Telegram groups/channels.

Following the sale of its assets, NGN was hired by DLI as its Asset Management Director over the recently acquired assets, which title and position was assumed by NGN's sole member and owner, Scott Offord. Subsequent to its acquisition of the Assets and appointment of Offord as the Asset Management Director, DLI became aware of certain actions by Offord which were causing damage and irreparable harm to DLI.

## Irreparable Harm

Those acts giving rise to the <u>irreparable harm</u> include, among others: (1) maliciously terminating DLI employees access to the "cryptomining.tools.com domain and restricting DLI access to the Telegram channels, both of which were DLI's primary tools for communicating with its vendors and customers; (2) hijacking the cryptomining.tools brand and domain for his personal use and to the detriment of DLI; (3) refusing to release the customer and user lists acquired by DLI and believed to be using them for his own marketing purpose; and, (4) using proprietary information from DLI, including pricing, processes, customer and vendor information, in direct breach of NGN' contractual covenant not to "make or cause to be made any unauthorized disclosure of other use of confidential information regarding the corporation or any of its activities."[2]

In view of these actions by defendants, a temporary restraining order or, in the alternative, a preliminary injunction is reasonable and necessary to protect DLI's legitimate business interests and shield it from the irreparable harm it would suffer from the widespread loss of customers, vendors and good will.

---

[2] Exhibit A. Independent Contractor Agreement at Section 7 (d).

**Statement of Facts**

DLI is a blockchain technology service provider with an infrastructure designed to support the blockchain ecosystem and the latest technological advancements. Its services include mining efforts, mining as a service, hardware sales, facility design and management, repair, servicing, and maintenance. DLI provides blockchain network infrastructure hosting and support on a proprietary, secure cloud environment. DLI's customer base includes governments, enterprise corporations and private entities.[3]

New Green Network LLC ("NGN") was formed by Offord in or around January, 2018 to provide sales and services to the crypto industry. Its products included Computing Equipment (miners from various vendors), Hardware, Software, Cables, and PDUs (power distribution unit). To facilitate its sales and service, NGN owned various marketing lists, specific channels for sales and services in Telegram, and operated under the cryptomining.tools ("CMT") brand.[4] Defendant, Milwaukee SEO, is and was at all times material, the registered agent for NGN and solely owned and managed by Offord.

In or about sometime in 2020, NGN was faced with potential bankruptcy as the result of sales of equipment to customers which was paid for but never delivered due to what was described by Offord as a "supplier issue" with a Chinese supplier.[5]

Sometime following notice of NGN's potential demise, DLI communicated to Offord its interest in acquiring NGN's assets to: (1) expand its miner sales business; (2) expand its PDU and cable sales business; (3) further expand its Sales, Marketing and Operational Services; and

---

[3] Verified Complaint at Rec. Doc 1 at ¶ 13.
[4] Id at ¶ 14
[5] Id at ¶¶ 16

(4) to expand its branding and reach across the crypto industries. Negotiations ensued between the parties resulting in Offord's agreement to sell the assets of NGN to DLI, and for him to work as an independent contractor with DLI "actively managing" the corporations assets.[6]

On or about December 1, 2020, NGN sold and assigned to DLI, its assets under an Asset Purchase Agreement executed by Offord as the "Owner" of NGN. The "Assets" sold by NGN to DLI consisted of the following:

1. "Crypto Mining Tools" ("CMT") brand.
2. Control of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups.
3. Cryptomining.Tools website, apps and code base.
4. Crypto Mining Tools Podcast.
5. New Green Network LLC customer base, user list.
6. Business development and access to relationships with hardware and software vendors worldwide.
7. 50% ownership in a pending trademark for the phrase "Blockchain Mining" for use in advertisements, magazines, tradeshows, etc..
8. Miner sales business and PDU design and manufacturing relationships.[7]

In consideration for the sale and assignment of these assets, DLI paid to Offord (NGN) five hundred thousand (500,000) of Class A voting stock and 500,000 shares of non-voting stock.[8]

In furtherance of its duties, NGN was provided the title of "Asset Management Director" which title was assumed by Offord as the owner, sole member/officer of NGN for which he was paid a salary by DLI. Offord, at all times material, held himself out to DLI, its actual and potential customers, and vendors as Asset Management Director of DLI.[9]

---

[6] Verified Complaint at Rec. Doc. at ¶ 17.
[7] Exhibit B. Asset Purchase Agreement at Section 2.
[8] Id at p. 3.
[9] Exhibit C-1, Posting by Offord; Exhibit C-2, Yahoo news story announcing sale of assets from NGN to DLI.

During the time of Offord's employment, DLI funded and developed multiple related business units which are now threatened and in jeopardy solely as a result of Offord's recent actions including his refusal to allow DLI employees access to the cryptomining.tools domain and Telegram channels, his use of DLI non-public confidential and proprietary information including customer and vendor lists, pricing, internal processes and customer and vendor contract terms, and DLI customer relationships. The DLI business units harmed include, but are not limited to, Equipment Sales, Equipment Repairs, Logistics, and Conference Services. In addition to his duties of actively managing the assets sold by NGN to DLI, Offord was also responsible for sales and marketing of "miners" on behalf of DLI, and of overseeing and directing DLI marketing and sales and related personnel. Offord has taken the confidential and proprietary information and documents of DLI and is using them to compete with DLI.

DLI, following its acquisition of the Assets from NGN, began to market using its newly acquired cryptomining.tools brand, and to run most of its sales and marketing communications through its cryptomining.tools domain and Telegram[10] groups. Offord, at his insistence as Asset Management Director, retained administrative control of the domain for cryptomining.tools and Telegram channels and continued to require DLI employees to use his personal server at "offord.me" to gain access to them. On or about October 25, 2021, Offord, as administrator of the domain, terminated all access of DLI to the domain and has refused to assign or transfer control of the domain to DLI.[11] Offord has also relatedly refused to provide the management, marketing and communication records relating to the cyptomining.tools domain and brand use.[12]

---

[10] Telegram is a cloud-based instant-messaging app that has a massive user base.
[11] Exhibit D, Email exchange between counsel for DLI and counsel for defendants.
[12] Exhibit E, Affidavit of Andersen.

In addition to hijacking DLI's cryptomining.tools domain and the company's Telegram channels, Offord was also discovered by DLI to have engaged in, among other, the following conduct in breach of his and NGN's contractual covenants, obligations and duties:

a. Despite the sale to DLI of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups, failed and refused to turn over administrative control of the Telegram groups. Access to this information and control were and are essential to DLI's marketing efforts and sales leads. On information and belief, other Telegram groups were created by Offord during his employment with DLI, but never disclosed to DLI, the actual owners of these Telegram groups. On information and belief, Offord has been and continues redirecting DLI customers to his own business using DLI marketing channels.

b. Despite the sale of NGN's customer base to DLI, Offord failed and refused despite repeated requests to provide an export spreadsheet/list of customers/vendors from NGN to DLI. On information and belief, Offord migrated this customer/vendor list to another account held in the name of Milwaukee SEO, LLC, another company owned by Offord.

c. Despite NGN's sale of these assets to DLI, Offord failed and refused to provide to DLI a comprehensive list of hardware and software vendors, suppliers, brokers and contact lists and, on information and belief, converted these lists to himself for his own benefit. This refusal has frustrated DLI's access to and relationship with vendors worldwide.

e. Has recently been discovered to have contacted DLI's Chinese vendor and instructed them to "redirect" certain items that he had previously ordered on DLI's behalf for one of

its customers to himself for one of his customers. DLI was therefore short these units for its customer for whom the products were originally ordered.[13]

f. Offord had been charged by DLI with negotiating a contract with a major vendor while employed by DLI but failed or refused to do so. DLI has recently learned that since his termination Offord entered into a contract with the vendor to the exclusion of DLI. On information and belief, Offord used proprietary and confidential information converted by him from DLI in order to obtain this contract. DLI has since been informed by the vendor that it is unable to supply product to DLI to meet its demand as a result of Offord's failure to enter into the contract while employed by DLI and his subsequent contract with the vendor following his departure from DLI.[14]

## Legal Analysis

The purpose of a temporary restraining order or preliminary injunction "is to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits." *Butler v Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000); *Unisource Worldwide, Inc. v S. Cent. Alabama Supply*, LLC, 199 F. Supp.2d 1994, 1199 (M.D. Ala. 2001). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the movant must show four factors to obtain a temporary restraining order or preliminary injunction:

> (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the relief is not granted; (3) that the threatened injury to the movant outweighs the potential harm to the non-movant; and (4) that the relief

---

[13] Exhibit E, Affidavit of Andersen.
[14] Id at ¶ 6.

will not disserve the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005); *Arthur v Allen*, 574 F. Supp. 2d 1252, 1255 (S.D. Ala. 2008).

**1. DLI Is Substantially Likely To Succeed On The Merits.**

DLI is substantially likely to prevail on the merits of its claims against Offord, NGN and Milwaukee SEO under the Independent Contractor Agreement. It is indisputable that the Independent Contractor Agreement is a valid and enforceable contract. The Independent Contractor Agreement is in writing, is signed by Offord on behalf of and as "owner" of NGN, and is supported by valuable consideration.[15] In particular, in exchange for the Assets, NGN/Offord received 1 million shares of company stock in DLI. In addition, NGN/Offord were paid an annual salary of $84 thousand to serve as Asset Management Director.[16]

The Assets were acquired by DLI from NGN/Offord. [17]. Offord has publicly acknowledged DLI's acquisition of the assets of NGN, including the cryptomining.tools domain and brand.[18] The Independent Contractor Agreement obligated NGN/Offord's as Asset Management Director to "actively manage" the Assets acquired from NGN pursuant to the Asset Purchase Agreement executed by the parties.

There is no dispute that the Assets of NGN/Offord were sold to and paid for by DLI. There is also no dispute that Offord has refused to transfer or assign the administration of the cryptomining.tools domain to DLI and has terminated DLI employee access to the domain.[19] The

---

[15] Exhibit B. Asset Purchase Agreement.
[16] Exhibit A. Independent Contractor Agreement..
[17] Exhibit B. Asset Purchase Agreement
[18] Exhibit C-1 and C-2.
[19] Exhibit F, Message from DLI employee dated October 28, 2021.

effect of this refusal and termination has been to impede DLI's abilities to communicate with its customers and vendors, most of whom had been communicating with DLI through the cryptomining.tools domain and Telegram channels. In addition to irreparably harming DLI's relationships with its customers and vendors, Offord has refused to forward the emails received by the domain from DLI's customers and vendors and, on information and belief is using this information for its own benefit to compete with DLI.

**2. DLI Will Suffer Irreparable Injury Absent Preliminary Injunctive Relief.**

Under federal law, a party will suffer irreparable harm where the potential loss cannot be adequately compensated by monetary remedies. *Ferrero v Associated Materials, Inc.* F.2d 1441, 1449 (11th Cir. 1991). Federal courts throughout Alabama, including the Eleventh Circuit, have repeatedly held that the loss of customer and goodwill constitutes irreparable harm sufficient to support injunctive relief. See, e.g., *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Serv*, LLC, 425 F.3d 964, 970 (11th. Cir. 2005) (stating that finding of significant loss of customers and goodwill is an irreparable injury"); *Unisource Worldwide, Inc. v. S. ent. Ala. Supply*, LLC, 199 F. Supp. 2d 1194, 1211-12 (M.D. Ala. 2001); See also: *Bonilla v Librati*, 2021 Wl 2580552, at *2 (S.D. Fla. Apr. 26, 2021), modified, 2021 WL 3396124 (S.D. Fla. Apr. 30, 2021).

The cryptomining.tools domain/brand, and the Telegram Groups were sold to DLI by Defendants. Subsequent to the sale, the cryptomining.tools domain, as well as the Telegram channels, became DLI's primary means of communication with customers and vendors. On or about October 28, 2021, Defendants terminated DLI's access to the cryptomining.tools domain and Telegram channels. This termination was intentional and malicious, and has adversely affected DLI's communications and relationships with its customers and vendors causing it

immediate and irreparable harm, injury and loss. In particular, Defendants, have not only obstructed DLI's ability to communicate with its customers and vendors, but have refused to forward or transfer emails/communications/attachments to and from the cryptomining.tools domain or Telegram channels to DLI.

Offord was terminated from DLI on October 28, 2021 following his hijacking of the cryptomining.tools domain and Telegram channels. Since his termination, DLI has experienced a significant drop in communications from clients and sales. In addition, DLI has now learned that Offord has redirected repair services previously provided by DLI to another entity in which he is believed to have an interest. DLI has also discovered that Offord has been using DLI proprietary and confidential information obtained during his employment with DLI to negotiate on his own behalf a contract with a primary vendor of DLI. Offord was instructed by DLI during his employment to negotiate with this vendor for a contract on DLI's behalf. For reasons only now becoming clear, Offord delayed contacting the vendor resulting in DLI losing the contract and has now negotiated his own contract with the vendor who as a result of its contract with Offord unable to supply DLI preventing it from servicing its customers.

Unless this Court issues a TRO or preliminary injunction directing defendants to immediately transfer and assign all rights as administrator to the cryptomining.tools domain and all Telegram channels, to forward to DLI all communications to or from the domain and Telegram channels that have been obstructed by Defendants, enjoining and restraining the defendants from further obstructions of Plaintiff's access to its cryptomining.tools domain and Telegram channels, and refrain from the use of any customer, contract, vendor or other confidential and proprietary information or documents made available to or obtained by

Defendants as the Asset Management Director of DLI, Plaintiff will continue to suffer irreparable and substantial harm.

**3. The Threatened Harm to DLI Outweighs any Potential Harm to Defendants.**

As discussed above, DLI's potential widespread loss of customers and vendors is and will cause it irreparable and continuing harm through the loss of customers and good will in the market. In contrast, the only harm to defendants would be a court order preventing them from knowingly and intentionally violating their contract with DLI, requiring them to transfer and assign their interest in the Assets sold to DLI, and cease using and return to Plaintiff all proprietary, confidential and/or trade secrets in defendant's possession or control including without limitation, all customer and vendor lists. Alabama courts have held that the balance of harms should weigh against a party "if the party knowingly and illegally placed itself in the position to be placed out of business if the preliminary injunction was granted or denied." *Unisource,* 199 F.Supp.2d at 1214.

Plaintiff paid to Defendants one million shares of its stock for the Assets of NGN. It also paid NGN/Offord a salary of $84,000 for serving as its Asset Management Director. Defendants have now interfered with Plaintiff's ownership and access to the Assets, using them for his own purpose to the disadvantage of Plaintiff. Plaintiff now seeks injunctive relief in the form of an order directing defendants to: (1) transfer and assign all rights to the Assets, including administrative control of the cryptomining.tools domain and website, and of the Telegram Groups ; (2) cease all use of the cryptomining.tools brand; (3) return to DLI all proprietary, confidential and trade secret information including without limitation customer and vendor lists, pricing information; planning information, processes and communications to or from DLI and its customers and vendors. These are all records and information owned by DLI to which there is no

apparent dispute. Accordingly, the granting of the requested relief would not cause any legitimate harm to defendants who have no standing to object to an order requiring their compliance with the law and applicable contract.

A temporary restraining order or preliminary injunction will not prohibit Defendants from conducting business. It will, however, require them to do so lawfully

**4. The Issuance of an Injunction Will Not Disserve the Public Interest.**

The issuance of a temporary restraining order or preliminary injunction in DLI's favor will not disserve the public interest. The public has a strong interest in requiring parties to comply with written contracts that they freely and voluntarily execute. See*: Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F.Supp.2d 1189, 1207 (N.D. Ala. 2009) ("[T]he Court does not believe that requiring [the defendant] to comply with its freely-agreed-to-contract would disserve the public interest."). Moreover, the enforcement of restrictive covenants serve the public interest because "companies have a legitimate public interest in keeping certain information confidential and maintaining their clientele" and because "companies need them to survive". *Unisource*, 199 F.Supp.2d at 1215.

Defendants freely and voluntarily executed two separate written contracts. The first was for the sale of the Assets to DLI. There is no dispute the Assets were sold to and paid for by DLI. The second was to work as an independent contractor managing the Assets for DLI. Defendants were paid substantial consideration in consideration for these agreements. As such, the public interest would be served by requiring Defendants to comply with the terms of the agreement and their obligations under Alabama law. Defendants' breaches of the Independent Contractor Agreement and his duties under Alabama law have and will continue to cause Plaintiff

substantial and irreparable harm, including the loss of customers, vendors and goodwill. A temporary restraining order or preliminary injunction requiring Defendants to comply with their contractual and legal obligations would serve the public interest by protecting DLI's interest in, *inter alia,* its confidential information, its customers, vendors and business systems and pricing.

## Conclusion

Based on the foregoing, Plaintiff, DLI, respectfully requests that the Court order that the defendants be preliminarily restrained, enjoined, and prohibited from or directed to:

(a) Immediately resign from and transfer and assign to DLI all rights as administrator to the cryptomining.tools domain and all Telegram channels;

(b) Refrain from any further use or obstruction of the cryptomining.tools domain and all Telegram channels sold to DLI;

(c) Return to DLI all communications to or from the domain and Telegram channels that have been obstructed by Defendants as well as all customer and vendor lists and information obtained from DLI; and,

(d) Refrain from using or selling any confidential, proprietary and trade secrets of DLI, including without limitation, any of the information sold by NGN to DLI.

                                      Respectfully Submitted,

                                      **LAW OFFICE OF**
                                      **DENNIS D. GREEN, JR., P.C.**

                                      /s/ Dennis D. Green, Jr.
                                      Dennis D. Green, Jr., Esq.
                                      Alabama Bar No. 7616-U22C
                                      dennis@lawofficeofdennisgreen.com
                                      132741 P.O. Box

Spring, Texas 77393
(470) 774-1288

**KOCH & SCHMIDT, LLC**

<u>/s/ R. Joshua Koch, Jr.</u>
R. Joshua Koch, Jr.
Louisiana Bar No. 007767
jkoch@kochschmidt.com
650 Poydras St., Suite 2660
New Orleans, Louisiana 70130

***Attorneys for Plaintiff, Distributed Ledger Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of November, 2021, the undersigned electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

<u>     /s/ R. Joshua Koch, Jr,     </u>
R. Joshua Koch, Jr.