Extremely Urgent

Visit ups.com for details on our privacy practices.

171604 8/18 BP

1 of 1

US DISTRICT COURTS
251-694-4271
US DISTRICT COURT
155 SAINT JOSEPH ST
MOBILE AL 36602

2 LBS          1 OF 1

SHIP TO:
SCOTT OFFORD

Refused   FHS

27/Nov/2021 16:51 5320



RETURN
TO:
US DISTRICT COURT
2516902371
155 ST JOSEPH ST
MOBILE AL 36602 3683

AL 366 0-60

1Z3388761296680779

UPS 3 DAY SELECT

TRACKING #: 1Z 338 876 12 9668 0779          3

BHP3HWC      WIELM638UDC   US   5320   NOV 27 18:51:44 2021   HIP 21.9.0   ZP4505

BILLING: P/P
SIGNATURE REQUIRED

Reference #1: 21-CV-490-KD-N

XOL21.11.24      WV45.48.0A.11/2021*



RETURN TO SHIPPER          27/Nov/2021 18:51 5320

REASON FOR RETURN:
RECEIVER DID NOT WANT, REFUSED DELIVERY
ORIGINAL RECEIVER:
SCOTT OFFORD

AL 366 0-60

1Z3388761296680779



US DISTRICT COURT
155 SAINT JOSEPH ST
MOBILE AL 36802-3683

P:BAMA      S:VILLAG      I:004      X

PHIL-5154          0779

1Z3388761296668



11/23/21, 2:39 PM

010195101 4/14 PAC United Parcel Service

This envelope is for use with the following services:

Next Day Air®
Worldwide Express™
Day Air®

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DISTRIBUTED LEDGER, INC** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NO.: 1:21-cv-490-KD-N** |
| **NEW GREEN NETWORK LLC,** | * | |
| **MILWAUKEE SEO LLC, and SCOTT** | * | |
| **OFFORD** | * | |

FILED DEC 3 '21 PM 1:27 USDC/ALS

### Defendants.

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

NOW COMES, Plaintiff, Distributed Ledger Inc. ("DLI," "Company," or "Plaintiff"), by and through its undersigned counsel of record, and respectfully moves this Honorable Court , pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a temporary restraining order and for a preliminary injunction directing that defendants, New Green Network LLC ("NGN"), Milwaukee SEO LLC ("Milwaukee SEO") and Scott Offord ("Offord") their agents, servants, employees and attorneys, and all others in active concert or participation with them be enjoined as follows:

a. To immediately transfer to DLI administrative control of the Cryptomining.tools domain and website;

b. To immediately transfer to DLI all emails and other communications received by the Offord.Me server to or from DLI or its employees following Offord's termination of their access to the Cryptomining.tools domain and website;

c. To immediately transfer administrative control of the Telegram Groups to DLI;

1

d. To cease using and to immediately return all Assets in defendants' possession or control;

f. Promptly stop using and return to DLI all proprietary, confidential and trade secret information, in defendants' possession, custody or control, including without limitation all customer and vendor lists, records and files.

This motion is based on all of the files and proceedings herein, including Distributed Ledger's Verified Complaint and attached exhibits, as well as for those reasons more fully set forth in Distributed Ledger's <u>Memorandum In Support</u> of its Motion for a Temporary Restraining Order and for Preliminary Injunction.

The undersigned counsel certifies that he has provided a copy of Plaintiff's Complaint for Temporary Restraining Order, Preliminary Injunction and Damages, and that he will make all reasonable efforts to advise defendants of the date and time of any hearing on plaintiff's request for TRO and preliminary injunction.

Dated this 19th day of November, 2021.

Respectfully Submitted,

**LAW OFFICE OF
DENNIS D. GREEN, JR., P.C.**

 /s/ Dennis D. Green, Jr. 
Dennis D. Green, Jr., Esq.
Alabama Bar No. 7616-U22C
dennis@lawofficeofdennisgreen.com
132741 P.O. Box
Spring, Texas 77393
(470) 774-1288

**KOCH & SCHMIDT, LLC**

/s/ R. Joshua Koch, Jr.
R. Joshua Koch, Jr.
Louisiana Bar No. 007767
jkoch@kochschmidt.com
650 Poydras St., Suite 2660
New Orleans, Louisiana 70130

***Attorneys for Plaintiff, Distributed Ledger Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2021, the undersigned electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

/s/ R. Joshua Koch, Jr.
R. Joshua Koch, Jr.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **DISTRIBUTED LEDGER, INC** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NO.: 1:21-cv-490-KD-N** |
| **NEW GREEN NETWORK LLC,** | * | |
| **MILWAUKEE SEO LLC, and SCOTT** | * | |
| **OFFORD** | | |
| | * | |

**Defendants.**

### MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Distributed Ledger, Inc. (hereafter "DLI"), respectfully submits the following

memorandum of law in support of its motion for a temporary restraining order ("TRO") and for a

preliminary injunction against defendants, New Green Network, LLC ("NGN"), Milwaukee

SEO, LLC ("Milwaukee SEO") and Scott Offord ("Offord").[1] Defendants, NGN, Offord and

Milwaukee SEO are and were the alter ego of the other and conspired to commit the acts

complained of.

### Introduction

Plaintiff, DLI, is in the business of selling and servicing equipment used in the mining of

cryptocurrency. In or around early December, 2020, Plaintiff purchased from defendant, New

Green Network, LLC ("NGN"), the majority, if not all, of its assets including, without limitation,

---

[1] Defendant's counsel was provided a copy of the Complaint and will be provided a copy of this motion and memorandum upon filing.

the brand, domain, website, apps and code base for "cryptomining.tools.com". DLI also acquired NGN's customer base, user list and multiple Telegram groups/channels.

Following the sale of its assets, NGN was hired by DLI as its Asset Management Director over the recently acquired assets, which title and position was assumed by NGN's sole member and owner, Scott Offord. Subsequent to its acquisition of the Assets and appointment of Offord as the Asset Management Director, DLI became aware of certain actions by Offord which were causing damage and irreparable harm to DLI.

## Irreparable Harm

Those acts giving rise to the irreparable harm include, among others: (1) maliciously terminating DLI employees access to the "cryptomining.tools.com domain and restricting DLI access to the Telegram channels, both of which were DLI's primary tools for communicating with its vendors and customers; (2) hijacking the cryptomining.tools brand and domain for his personal use and to the detriment of DLI; (3)  refusing to release the customer and user lists acquired by DLI and believed to be using them for his own marketing purpose; and, (4) using proprietary information from DLI, including pricing, processes, customer and vendor information, in direct breach of NGN' contractual covenant not to "make or cause to be made any unauthorized disclosure of other use of confidential information regarding the corporation or any of its activities."[2]

In view of these actions by defendants, a temporary restraining order or, in the alternative, a preliminary injunction is reasonable and necessary to protect DLI's legitimate business interests and shield it from the irreparable harm it would suffer from the widespread loss of customers, vendors and good will.

---

[2] Exhibit A. Independent Contractor Agreement at Section 7 (d).

### Statement of Facts

DLI is a blockchain technology service provider with an infrastructure designed to support the blockchain ecosystem and the latest technological advancements. Its services include mining efforts, mining as a service, hardware sales, facility design and management, repair, servicing, and maintenance. DLI provides blockchain network infrastructure hosting and support on a proprietary, secure cloud environment. DLI's customer base includes governments, enterprise corporations and private entities.[3]

New Green Network LLC ("NGN") was formed by Offord in or around January, 2018 to provide sales and services to the crypto industry. Its products included Computing Equipment (miners from various vendors), Hardware, Software, Cables, and PDUs (power distribution unit). To facilitate its sales and service, NGN owned various marketing lists, specific channels for sales and services in Telegram, and operated under the cryptomining.tools ("CMT") brand.[4] Defendant, Milwaukee SEO, is and was at all times material, the registered agent for NGN and solely owned and managed by Offord.

In or about sometime in 2020, NGN was faced with potential bankruptcy as the result of sales of equipment to customers which was paid for but never delivered due to what was described by Offord as a "supplier issue" with a Chinese supplier. [5]

Sometime following notice of NGN's potential demise, DLI communicated to Offord its interest in acquiring NGN's assets to: (1) expand its miner sales business; (2) expand its PDU and cable sales business; (3) further expand its Sales, Marketing and Operational Services; and

---

[3] Verified Complaint at Rec. Doc 1 at ¶ 13.
[4] Id at ¶ 14
[5] Id at ¶¶ 16

(4) to expand its branding and reach across the crypto industries.  Negotiations ensued between the parties resulting in Offord's agreement to sell the assets of NGN to DLI, and for him to work as an independent contractor with DLI "actively managing" the corporations assets.[6]

On or about December 1, 2020, NGN sold and assigned to DLI, its assets under an Asset Purchase Agreement executed by Offord as the "Owner" of NGN. The "Assets" sold by NGN to DLI consisted of the following:

1. "Crypto Mining Tools" ("CMT") brand.
2. Control of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups.
3. Cryptomining.Tools website, apps and code base.
4. Crypto Mining Tools Podcast.
5. New Green Network LLC customer base, user list.
6. Business development and access to relationships with hardware and software vendors worldwide.
7. 50% ownership in a pending trademark for the phrase "Blockchain Mining" for use in advertisements, magazines, tradeshows, etc..
8. Miner sales business and PDU design and manufacturing relationships.[7]

In consideration for the sale and assignment of these assets, DLI paid to Offord (NGN) five hundred thousand (500,000) of Class A voting stock and 500,000 shares of non-voting stock.[8]

In furtherance of its duties, NGN was provided the title of "Asset Management Director" which title was assumed by Offord as the owner, sole member/officer of NGN for which he was paid a salary by DLI. Offord, at all times material, held himself out to DLI, its actual and potential customers, and vendors as Asset Management Director of DLI. [9]

---

[6] Verified Complaint at Rec. Doc. at ¶ 17.
[7] Exhibit B. Asset Purchase Agreement at Section 2.
[8] Id at p. 3.
[9] Exhibit C-1, Posting by Offord; Exhibit C-2, Yahoo news story announcing sale of assets from NGN to DLI.

During the time of Offord's employment, DLI funded and developed multiple related business units which are now threatened and in jeopardy solely as a result of Offord's recent actions including his refusal to allow DLI employees access to the cryptomining.tools domain and Telegram channels, his use of DLI non-public confidential and proprietary information including customer and vendor lists, pricing, internal processes and customer and vendor contract terms, and DLI customer relationships. The DLI business units harmed include, but are not limited to, Equipment Sales, Equipment Repairs, Logistics, and Conference Services. In addition to his duties of actively managing the assets sold by NGN to DLI, Offord was also responsible for sales and marketing of "miners" on behalf of DLI, and of overseeing and directing DLI marketing and sales and related personnel. Offord has taken the confidential and proprietary information and documents of DLI and is using them to compete with DLI.

DLI, following its acquisition of the Assets from NGN, began to market using its newly acquired cryptomining.tools brand, and to run most of its sales and marketing communications through its cryptomining.tools domain and Telegram[10] groups. Offord, at his insistence as Asset Management Director, retained administrative control of the domain for cryptomining.tools and Telegram channels and continued to require DLI employees to use his personal server at "offord.me" to gain access to them. On or about October 25, 2021, Offord, as administrator of the domain, terminated all access of DLI to the domain and has refused to assign or transfer control of the domain to DLI.[11] Offord has also relatedly refused to provide the management, marketing and communication records relating to the cyptomining.tools domain and brand use.[12]

---

[10]Telegram is a cloud-based instant-messaging app that has a massive user base.

[11] Exhibit D, Email exchange between counsel for DLI and counsel for defendants.

[12] Exhibit E, Affidavit of Andersen.

In addition to hijacking DLI's cryptomining.tools domain and the company's Telegram channels, Offord was also discovered by DLI to have engaged in, among other, the following conduct in breach of his and NGN's contractual covenants, obligations and duties:

a. Despite the sale to DLI of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups, failed and refused to turn over administrative control of the Telegram groups. Access to this information and control were and are essential to DLI's marketing efforts and sales leads. On information and belief, other Telegram groups were created by Offord during his employment with DLI, but never disclosed to DLI, the actual owners of these Telegram groups. On information and belief, Offord has been and continues redirecting DLI customers to his own business using DLI marketing channels.

b. Despite the sale of NGN's customer base to DLI, Offord failed and refused despite repeated requests to provide an export spreadsheet/list of customers/vendors from NGN to DLI. On information and belief, Offord migrated this customer/vendor list to another account held in the name of Milwaukee SEO, LLC, another company owned by Offord.

c. Despite NGN's sale of these assets to DLI, Offord failed and refused to provide to DLI a comprehensive list of hardware and software vendors, suppliers, brokers and contact lists and, on information and belief, converted these lists to himself for his own benefit. This refusal has frustrated DLI's access to and relationship with vendors worldwide.

e. Has recently been discovered to have contacted DLI's Chinese vendor and instructed them to "redirect" certain items that he had previously ordered on DLI's behalf for one of

its customers to himself for one of his customers. DLI was therefore short these units for its customer for whom the products were originally ordered.[13]

f. Offord had been charged by DLI with negotiating a contract with a major vendor while employed by DLI but failed or refused to do so. DLI has recently learned that since his termination Offord entered into a contract with the vendor to the exclusion of DLI. On information and belief, Offord used proprietary and confidential information converted by him from DLI in order to obtain this contract. DLI has since been informed by the vendor that it is unable to supply product to DLI to meet its demand as a result of Offord's failure to enter into the contract while employed by DLI and his subsequent contract with the vendor following his departure from DLI.[14]

## Legal Analysis

The purpose of a temporary restraining order or preliminary injunction "is to protect the movant from irreparable injury and to preserve the status quo until the district court renders a meaningful decision on the merits." *Butler v Ala. Judicial Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000); *Unisource Worldwide, Inc. v S. Cent. Alabama Supply*, LLC, 199 F. Supp.2d 1994, 1199 (M.D. Ala. 2001). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the movant must show four factors to obtain a temporary restraining order or preliminary injunction:

(1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the relief is not granted; (3) that the threatened injury to the movant outweighs the potential harm to the non-movant; and (4) that the relief

---

[13] Exhibit E, Affidavit of Andersen.
[14] Id at ¶ 6.

will not disserve the public interest. *Schiavo ex rel. Schindler v. Schiavo*, 403

F.3d 1223, 1225 (11th Cir. 2005); *Arthur v Allen*, <u>574 F. Supp. 2d 1252, 1255</u>

(S.D. Ala. 2008).

## 1. DLI Is Substantially Likely To Succeed On The Merits.

DLI is substantially likely to prevail on the merits of its claims against Offord, NGN and

Milwaukee SEO under the Independent Contractor Agreement. It is indisputable that the

Independent Contractor Agreement is a valid and enforceable contract. The Independent

Contractor Agreement is in writing, is signed by Offord on behalf of and as "owner" of NGN,

and is supported by valuable consideration.[15] In particular, in exchange for the Assets,

NGN/Offord received 1 million shares of company stock in DLI. In addition, NGN/Offord were

paid an annual salary of $84 thousand to serve as Asset Management Director.[16]

The Assets were acquired by DLI from NGN/Offord. [17]. Offord has publicly

acknowledged DLI's acquisition of the assets of NGN, including the cryptomining.tools domain

and brand.[18] The Independent Contractor Agreement obligated NGN/Offord's as Asset

Management Director to "actively manage" the Assets acquired from NGN pursuant to the Asset

Purchase Agreement executed by the parties.

There is no dispute that the Assets of NGN/Offord were sold to and paid for by DLI.

There is also no dispute that Offord has refused to transfer or assign the administration of the

cryptomining.tools domain to DLI and has terminated DLI employee access to the domain.[19] The

---

[15] Exhibit B. Asset Purchase Agreement.
[16] Exhibit A. Independent Contractor Agreement..
[17] Exhibit B. Asset Purchase Agreement
[18] Exhibit C-1 and C-2.
[19] Exhibit F, Message from DLI employee dated October 28, 2021.

effect of this refusal and termination has been to impede DLI's abilities to communicate with its customers and vendors, most of whom had been communicating with DLI through the cryptomining.tools domain and Telegram channels. In addition to irreparably harming DLI's relationships with its customers and vendors, Offord has refused to forward the emails received by the domain from DLI's customers and vendors and, on information and belief is using this information for its own benefit to compete with DLI.

**2. DLI Will Suffer Irreparable Injury Absent Preliminary Injunctive Relief.**

Under federal law, a party will suffer irreparable harm where the potential loss cannot be adequately compensated by monetary remedies. *Ferrero v Associated Materials, Inc.* F.2d 1441, 1449 (11th Cir. 1991). Federal courts throughout Alabama, including the Eleventh Circuit, have repeatedly held that the loss of customer and goodwill constitutes irreparable harm sufficient to support injunctive relief. See, e.g., *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Serv*, LLC, 425 F.3d 964, 970 (11th. Cir. 2005) (stating that finding of significant loss of customers and goodwill is an irreparable injury"); *Unisource Worldwide, Inc. v. S. ent. Ala. Supply*, LLC, 199 F. Supp. 2d 1194, 1211-12 (M.D. Ala. 2001); See also: *Bonilla v Librati*, 2021 Wl 2580552, at *2 (S.D. Fla. Apr. 26, 2021), modified, 2021 WL 3396124 (S.D. Fla. Apr. 30, 2021).

The cryptomining.tools domain/brand, and the Telegram Groups were sold to DLI by Defendants. Subsequent to the sale, the cryptomining.tools domain, as well as the Telegram channels, became DLI's primary means of communication with customers and vendors. On or about October 28, 2021, Defendants terminated DLI's access to the cryptomining.tools domain and Telegram channels. This termination was intentional and malicious, and has adversely affected DLI's communications and relationships with its customers and vendors causing it

immediate and irreparable harm, injury and loss.  In particular, Defendants, have not only obstructed DLI's ability to communicate with its customers and vendors, but have refused to forward or transfer emails/communications/attachments to and from the cryptomining.tools domain or Telegram channels to DLI.

Offord was terminated from DLI on October 28, 2021 following his hijacking of the cryptomining.tools domain and Telegram channels. Since his termination, DLI has experienced a significant drop in communications from clients and sales. In addition, DLI has now learned that Offord has redirected repair services previously provided by DLI to another entity in which he is believed to have an interest. DLI has also discovered that Offord has been using DLI proprietary and confidential information obtained during his employment with DLI to negotiate on his own behalf a contract with a primary vendor of DLI. Offord was instructed by DLI during his employment to negotiate with this vendor for a contract on DLI's behalf. For reasons only now becoming clear, Offord delayed contacting the vendor resulting in DLI losing the contract and has now negotiated his own contract with the vendor who as a result of its contract with Offord unable to supply DLI preventing it from servicing its customers.

Unless this Court issues a TRO or preliminary injunction directing defendants to immediately transfer and assign all rights as administrator to the cryptomining.tools domain and all Telegram channels, to forward to DLI all communications to or from the domain and Telegram channels that have been obstructed by Defendants, enjoining and restraining the defendants from further obstructions of Plaintiff's access to its cryptomining.tools domain and Telegram channels, and refrain from the use of any customer, contract, vendor or other confidential and proprietary information or documents made available to or obtained by

Defendants as the Asset Management Director of DLI, Plaintiff will continue to suffer irreparable and substantial harm.

## 3. The Threatened Harm to DLI Outweighs any Potential Harm to Defendants.

As discussed above, DLI's potential widespread loss of customers and vendors is and will cause it irreparable and continuing harm through the loss of customers and good will in the market. In contrast, the only harm to defendants would be a court order preventing them from knowingly and intentionally violating their contract with DLI, requiring them to transfer and assign their interest in the Assets sold to DLI, and cease using and return to Plaintiff all proprietary, confidential and/or trade secrets in defendant's possession or control including without limitation, all customer and vendor lists. Alabama courts have held that the balance of harms should weigh against a party "if the party knowingly and illegally placed itself in the position to be placed out of business if the preliminary injunction was granted or denied." *Unisource,* 199 F.Supp.2d at 1214.

Plaintiff paid to Defendants one million shares of its stock for the Assets of NGN. It also paid NGN/Offord a salary of $84,000 for serving as its Asset Management Director. Defendants have now interfered with Plaintiff's ownership and access to the Assets, using them for his own purpose to the disadvantage of Plaintiff. Plaintiff now seeks injunctive relief in the form of an order directing defendants to: (1) transfer and assign all rights to the Assets, including administrative control of the cryptomining.tools domain and website, and of the Telegram Groups ; (2) cease all use of the cryptomining.tools brand; (3) return to DLI all proprietary, confidential and trade secret information including without limitation customer and vendor lists, pricing information; planning information, processes and communications to or from DLI and its customers and vendors. These are all records and information owned by DLI to which there is no

apparent dispute. Accordingly, the granting of the requested relief would not cause any legitimate harm to defendants who have no standing to object to an order requiring their compliance with the law and applicable contract.

A temporary restraining order or preliminary injunction will not prohibit Defendants from conducting business. It will, however, require them to do so lawfully

## 4. The Issuance of an Injunction Will Not Disserve the Public Interest.

The issuance of a temporary restraining order or preliminary injunction in DLI's favor will not disserve the public interest. The public has a strong interest in requiring parties to comply with written contracts that they freely and voluntarily execute. See: *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F.Supp.2d 1189, 1207 (N.D. Ala. 2009) ("[T]he Court does not believe that requiring [the defendant] to comply with its freely-agreed-to-contract would disserve the public interest."). Moreover, the enforcement of restrictive covenants serve the public interest because "companies have a legitimate public interest in keeping certain information confidential and maintaining their clientele" and because "companies need them to survive". *Unisource*, 199 F.Supp.2d at 1215.

Defendants freely and voluntarily executed two separate written contracts. The first was for the sale of the Assets to DLI. There is no dispute the Assets were sold to and paid for by DLI. The second was to work as an independent contractor managing the Assets for DLI. Defendants were paid substantial consideration in consideration for these agreements. As such, the public interest would be served by requiring Defendants to comply with the terms of the agreement and their obligations under Alabama law. Defendants' breaches of the Independent Contractor Agreement and his duties under Alabama law have and will continue to cause Plaintiff

substantial and irreparable harm, including the loss of customers, vendors and goodwill. A temporary restraining order or preliminary injunction requiring Defendants to comply with their contractual and legal obligations would serve the public interest by protecting DLI's interest in, *inter alia,* its confidential information, its customers, vendors and business systems and pricing.

## Conclusion

Based on the foregoing, Plaintiff, DLI, respectfully requests that the Court order that the defendants be preliminarily restrained, enjoined, and prohibited from or directed to:

(a) Immediately resign from and transfer and assign to DLI all rights as administrator to the cryptomining.tools domain and all Telegram channels;

(b) Refrain from any further use or obstruction of the cryptomining.tools domain and all Telegram channels sold to DLI;

(c) Return to DLI all communications to or from the domain and Telegram channels that have been obstructed by Defendants as well as all customer and vendor lists and information obtained from DLI; and,

(d) Refrain from using or selling any confidential, proprietary and trade secrets of DLI, including without limitation, any of the information sold by NGN to DLI.

Respectfully Submitted,

**LAW OFFICE OF
DENNIS D. GREEN, JR., P.C.**

 /s/ Dennis D. Green, Jr.
Dennis D. Green, Jr., Esq.
Alabama Bar No. 7616-U22C
dennis@lawofficeofdennisgreen.com
132741 P.O. Box

Spring, Texas 77393
(470) 774-1288

**KOCH & SCHMIDT, LLC**

/s/ R. Joshua Koch, Jr.
R. Joshua Koch, Jr.
Louisiana Bar No. 007767
jkoch@kochschmidt.com
650 Poydras St., Suite 2660
New Orleans, Louisiana 70130

***Attorneys for Plaintiff, Distributed Ledger Inc.***

### CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2021, the undersigned electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all counsel of record.

/s/ R. Joshua Koch, Jr.
R. Joshua Koch, Jr.

# DISTRIBUTED LEDGER, INC.
# INDEPENDENT CONTRACTOR AGREEMENT

This Agreement is made and effective as of December 1, 2020 by and between Distributed Ledger, Inc., a For-Profit Texas Corporation (the "Corporation") and New Green Network, LLC (the "Contractor") and supersedes any prior employment-related agreement or agreements between the Corporation and Contractor. Unless the context otherwise requires, all references to a designated section refers to the designated provision of this Agreement.

Statement of Agreement:

FOR AND IN CONSIDERATION of the mutual promises and covenants set forth herein, Corporation hereby agrees to the employment of Contractor on the following terms and conditions and, except to the extent specifically superseded by this Agreement, subject to all of the Corporation's policies and procedures regarding its employees:

**1. Position.** Commencing as of the execution of this Agreement (the "Effective Date"), Contractor shall serve as the Asset Management Director of certain assets of the Corporation with all authority and corresponding responsibility of an Asset Management Director of a corporation under Texas law, subject to the overall authority of the Chief Executive Officer ("CEO") and the Corporation's certificate of formation, bylaws, regulations, and other governing documents.

**2. Specific Authority and Responsibility.** Not in limitation of the authority and responsibility of the position as described in Section 1, Contractor shall report directly to the CEO. In addition, Contractor shall perform any special duties assigned or delegated to Contractor by the CEO and, unless otherwise directed by the CEO, shall actively manage the following Corporation assets:

- Crypto Mining Tools brand
- 20,000 subscriber blockchain mining email list and multiple popular Telegram groups
- cryptomining.tools website, apps and code base
- Crypto Mining Tools Podcast
- New Green Network LLC customer base
- Business Development and access to relationships with hardware and software vendors worldwide
- 50% ownership in a pending trademark for the phrase "Blockchain Mining" for use in magazines, tradeshows
- PDU design and manufacturer relationship

**3. Term.** The term of employment shall continue indefinitely or until terminated by death of Contractor or as follows by discharge or resignation, whichever, comes sooner:

(a) Discharge. By the Corporation's giving written notice of discharge which is received by Contractor at least 30 days before the effective date of termination and provided further that if such discharge is claimed by the Corporation to be for Cause (as defined herein), the notice of such discharge shall state such Cause, and in such event the effective date of termination may, if stated in the notice, be immediate upon giving of the notice;

(b) Resignation. By Contractor's giving written notice of resignation which is received by the Chairman or other person serving as chair of the Board of the Corporation at least 90 days before the effective date of termination; provided that if the resignation is claimed by Contractor to be for Good Reason (as defined herein), the notice of such resignation shall state such Good Reason, and in such event the effective date of termination may, if stated in the notice, be immediate upon giving of the notice.

**4. Base Salary.** The Corporation agrees to pay or cause to be paid to Contractor for Contractor's services during the term of this Agreement an annual base salary at the gross rate prior to all taxes and other withholdings of $84,000.00, payable in monthly periodic installments, no later than by the last day of the month ("Base Salary"). This Base Salary will be subject to annual review and may be adjusted from time to time under direction of the CEO considering factors such as Contractor's performance, compensation of similar Contractors of similarly sized and located companies in the Southeastern United States, and other pertinent factors. The Base Salary shall be payable in US Currency.

**5. Benefits.** Contractor is a 10-99 subcontractor; Contractor shall be entitled to participate in all employee practices and programs maintained by the Corporation and made available to all subcontractors generally and as may be in effect from time to time.

A

**6. Severance Payments and Benefits and Liquidated Damages.**

(a) General. If Contractor's employment is terminated for any reason, including death, disability, discharge by the Corporation, or resignation by Contractor, Contractor shall be entitled to receive, and the Corporation shall cause to be paid, any earned but unpaid periodic payments of Contractor's then Base Salary.

(b) Death; Discharge without Cause; or Resignation for Good Reason. If Contractor's employment is terminated by death, or the Corporation discharges Contractor pursuant to Section 6(f) other than for Cause, or Contractor resigns pursuant to Section 6(f) for Good Reason, Contractor shall be entitled to, and the Corporation shall cause, the following in addition to the payment provided by Section 6(a):

> (1) Severance Pay. The Corporation shall pay Contractor severance pay equal to continuation of Contractor's then Base Salary for a period of an additional **1 month** for every year employed by Corporation, after the effective date of termination of employment.

(c) Dispute as to Existence of Cause or Good Reason. Any discharge claimed for Cause or resignation claimed for Good Reason shall be so stated in the notice thereof, and any dispute between the Corporation and Contractor as to the existence of Cause or Good Reason shall be resolved as provided in Section 8.

(d) Cause shall exist if Contractor:

> (1) Is convicted of, or pleads guilty or nolo contendere to, a felony or any act amounting to embezzlement, fraud, or theft or involving moral turpitude (whether or not against Corporation or another employee); jurisdiction, a felony resulting in death or substantial bodily or psychological harm to, or other act of moral turpitude harming, any person;

> (2) Willfully engages in conduct demonstrably and materially injurious to the goodwill and reputation of the Corporation;

> (3) Willfully causes the Corporation other than pursuant to the advice of Corporation legal counsel to violate a law which, in the opinion of Corporation legal counsel, is reasonable grounds for civil or criminal penalties against the Corporation or its Board;

> (4) Willfully engages in conduct which constitutes a violation of the established written policies or procedures of the Corporation regarding the conduct of its employees, including policies regarding sexual harassment of employees and use of illegal drugs or substances;

> (5) Without due cause fails within 30 days after receipt of notice to follow any lawful order given by or under direction of the CEO;

> (6) Does not correct within 30 days after receipt of notice any act or omission that, in the opinion of the Corporation's legal counsel, gives rise to a cause of action by the Corporation or its Board personally against Contractor to specifically enforce or restrain some action for purpose of avoiding some loss or damage, or to recover losses or damages, for an amount in excess of $10,000.00;

> (7) Does not correct within 30 days after receipt of notice any act of dishonesty against the Corporation; or

> (8) Fails within 30 days after receipt of notice to cure any violations of Contractor's covenants under Section 7.

> (9) Intentionally criticizes, ridicules or disparages the Corporation or the Board in any communications or with any customer or client, vendor or supplier, or in any public statement

(f) Good Reason shall exist in the absence of Cause if:

> (1) Contractor ceases to hold position and title of Asset Management Director as contemplated by Section 1 of this Agreement, or a position and title of a more senior position which Contractor accepts;

> (2) Contractor is assigned, without Contractor's consent, authority or responsibility materially inconsistent with authority and responsibility contemplated by Section 2 of this Agreement, including without limitation any material diminution of Contractor's authority and responsibility for supervision and compensation of all

Corporation personnel or change in reporting requirements to anyone other than the Board or its duly authorized committees;

(3) There is any reduction in or a material delay in payment of Base Salary or material reduction in benefits from those required to be provided in accordance with Sections 4 or 5 of this Agreement;

(4) Any requirement is imposed by the Corporation or under direction of its Board or any person controlling the Corporation for Contractor to reside outside of the Mobile, Alabama metropolitan area, other than on travel reasonably required to carry out Contractor's obligations under this Agreement;

(5) Contractor becomes disabled (to the extent that Contractor cannot, with reasonable accommodation, effectively perform the requirements of Contractor's position) and is unable to effectively exercise Contractor's authority and perform Contractor's responsibility under this Agreement;

(6) The Corporation fails to obtain an agreement from any successor or assign of the Corporation to assume and agree to perform the obligations of the Corporation under this Agreement; and

(7) The Corporation does not correct within 30 days after receipt of notice any act or omission that gives rise to a cause of action by Contractor personally against the Corporation to specifically enforce or restrain some action for purpose of avoiding some loss or damage, or to recover losses or damages, for an amount in excess of $10,000.

**7. Contractor Covenants.** Without the prior written consent of the Corporation, Contractor shall not, directly or indirectly:

(a) No Unauthorized Competing Concern. (1) During the term of Contractor's employment and during any Continuation Period, either alone or as a member of a partnership or association, or as an officer, director, advisor, consultant, agent, or employee of any other organization, be engaged in or concerned with any other duties or pursuits requiring Contractor's active personal services that will conflict with Contractor's ability or objectivity in performing Contractor's obligations under this Agreement.

(b) No Disloyal Act. During the term of Contractor's employment, take any action regarding the Corporation, its operations or property, that in good faith Contractor knows or should reasonably know is opposed to the best interests of the Corporation;

(c) No Unauthorized Usurpation of Corporation Opportunity. During the term of Contractor's employment, take advantage of any Corporation opportunity without first offering the opportunity with full disclosure of material facts to the Corporation and receiving notice that the Corporation has declined such opportunity. For this purpose, "Corporation Opportunity" means any opportunity to engage in a business activity: (1) Of which Contractor becomes aware (A) by virtue of Contractor's relationship with, or in connection with performing functions in the business of, or in using facilities or other resources of the Corporation, and (B) under circumstances that should reasonably lead Contractor to believe that the person offering the opportunity expects it to be offered to the Corporation; or (2) which Contractor knows is closely related to a business in which the Corporation is engaged or expected to engage;

(d) No Unauthorized Disclosure. During the term of Contractor's employment and thereafter, make or cause to be made any unauthorized disclosure or other use of any confidential information regarding the Corporation or any of its activities and operations, except to the extent reasonably necessary or appropriate in connection with the performance by Contractor of Contractor's authority and responsibility under this Agreement or as may be legally required; provided, however, that nothing herein contained shall preclude the use or disclosure of any information known generally to the public (other than as a result of disclosure by Contractor in violation of this Section 7(d));

(e) No Disparagement. During the term of Contractor's employment, criticize, ridicule or make any statement which disparages or is derogatory of the Corporation or any person affiliated with the Corporation in any communications with any customer or client, vendor or supplier of the Corporation or in any public statement.

**8. Representation as to Limitations.** Contractor represents and warrants that Contractor is not under any contractual or legal restraint that prevents or prohibits Contractor from entering into this Agreement or performing the duties and obligations described in this Agreement.

**9. Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Corporation, its successors and assigns and shall be binding upon Contractor, Contractor's administrators, executors, legatees, heirs, and

other legal representatives. The Corporation shall require any successor or assign to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform it if no such succession or assignment had taken place. Except to the extent the context otherwise requires, the term the "Corporation" as used herein shall include any such successors and assigns to the Corporation's operations or assets. Neither this Agreement nor any right or interest hereunder shall be assignable or transferable by Contractor, Contractor's administrators, executors, legatees, heirs, and other legal representatives, except by will or by the laws of descent and distribution.

**10. Notices.** Any notice to be given to a person hereunder shall be given by United States certified mail or by personal delivery or by fax transmission (provided that within 24 hours a written copy of such transmission is deposited in United States certified mail or personally delivered), with return receipt by the addressee requested, and addressed, to the Corporation, at its principal place of business to the attention of the Chairman of the Board and, to Contractor at Contractor's address on the employment records of the Corporation, or at such other address most recently designated by that person for this purpose. Any notice shall be deemed given upon the date of receipt stated in the returned receipt or, if the address most recently specified by the addressee as provided above is not a valid address, the date of a returned receipt or other certification of the United States post office for such address certifying that the same is not a valid mailing address and that no forwarding address is known to such post office.

**11. Amendment/Waiver.** No amendment or waiver of any provision of this Agreement shall be implied by any failure of any party to enforce any remedy upon the violation of such provision, even if such violation is continued or repeated subsequently, and in no event shall any amendment or waiver of any provision of this Agreement be effective against any party hereto unless expressed in writing signed by that party. No express waiver shall affect any provision other than the one specified in such waiver, and that only for the time and in the manner specifically stated.

**12. Construction.** As used in this Agreement, the singular shall include the plural and any and all gender shall include all genders as the context requires. Unless the context otherwise requires, use of any form of the term "include" shall mean including without limitation; and use of the term "or" is not intended to be exclusive unless the context otherwise clearly requires.

**13. Headings.** The headings and captions are for convenience only and shall not be deemed to limit, construe, affect, or alter the meaning of the underlying provisions.

**14. Severability.** If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any jurisdiction for any reason, such invalidity, illegality, or unenforceability shall not affect the remainder of this Agreement, and the remainder of this Agreement shall be construed and enforced as if such invalid, illegal, or unenforceable portion were not contained herein.

**15. Attorneys Fees.** In the event of any dispute arising out of, from or in connection with this Agreement, or suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or dispute and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

**16. Choice of Venue.** Any disputes arising under or related to this Agreement or regarding the legal rights or obligations of any of the parties to this Agreement. If any issues in dispute are not resolved, any party may, by written notice to the other, demand that the dispute be resolved by a court of competent jurisdiction in and for Baldwin County, Alabama.

**17. Governing Law.** This Agreement shall be construed and enforced under and in accordance with the laws of the State of Alabama without giving effect to the conflict of law principles thereof.

**18. Waiver of Right to Trial by Jury.** THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW OR EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED FOR AGREEMENT, AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the 21st day of November 2020.


**DISTRUBUTED LEDGER, INC.**

By:_____
    John Michael Francis, II
    Chief Contractor Officer
    Distributed Ledger, Inc.

**CONTRACTOR**

By:_____

    Scott Offord

**ASSET PURCHASE AGREEMENT**

by and among

**DISTRIBUTED LEDGER, INC.**

as the Buyer,

and

**NEW GREEN NETWORK, LLC**

as the Seller,

B

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**"), dated as of December 1, 2020 (the "**Effective Date**") is entered into by and among **DISTRIBUTED LEDGER, INC.**, a Texas corporation (the "**Buyer**"), and **NEW GREEN NETWORK, LLC**, a Wisconsin limited liability company[1] (the "**Seller**"). The Buyer and Seller are hereby collectively referred to as the "**Parties**," or singularly as a "**Party**."

### RECITALS

**WHEREAS,** the Parties have determined that it is in their best interests for the Seller to sell to the Buyer and for the Buyer to buy from the Seller (a) all of the assets detailed in *Section 1.1* of this Agreement (collectively , the "**Assets**") on the terms and conditions contained in this Agreement (the "**Acquisition**"); and

**WHEREAS,** the Parties hereto desire to make certain representations, warranties, covenants, and agreements in connection with the Acquisition.

**NOW THEREFORE,** in consideration of the mutual representations, warranties, covenants, and agreements set forth herein, the Seller and the Buyer agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF ASSETS

#### 1.1    **Purchase and Sale of Assets**

Upon the terms and subject to the conditions contained in this Agreement, at the Closing (hereinafter defined), the Seller shall sell, assign, transfer, and convey to the Buyer, and the Buyer shall purchase, acquire, and accept from the Seller all of the assets of the Seller used in the Business, including without limitation, those listed below, free and clear of all Liens except Permitted Liens (hereinafter defined) (collectively the "**Purchased Assets**"):

- Crypto Mining Tools brand
- 20,000 subscriber blockchain mining email list and multiple popular Telegram groups
- cryptomining.tools website, apps and code base
- Crypto Mining Tools Podcast
- New Green Network LLC customer base
- Access to relationships with hardware and software vendors worldwide
- 50% ownership in a pending trademark for the phrase "Blockchain Mining" for use in magazines, tradeshows
- Sponsorship, exhibit booths and tickets to two major 2021 bitcoin/blockchain conferences
- PDU design and manufacturer relationship

#### 1.2    **Retained Assets**

The Seller will retain ownership of all Seller assets not specifically identified in Section 1.1 (collectively, the "**Retained Assets**")

## 1.3 **Purchase Price**

The purchase price for the Purchased Assets shall be in the form of shares of Buyer's stock, in the following amounts: 500,000 Class B shares (pending a 90-day vestment period during reconciliation of the Business) and 500,000 Class A shares (the "**Purchase Price**").

## 1.4 **Time and Place of Closing**

Subject to the term and provisions of this Agreement, including Article 7 of this Agreement, the closing of the transactions described in this Article I (the "**Closing**") shall be by electronic mail and overnight courier service, or by physical exchange of documentation at the offices of Law Office of Dennis D. Green, Jr., P.C., 5223 Pointe Spring Xing, Spring, TX 77389, on or about December 1, 2020 or at such other place or time as the Parties may agree. The date upon which the Closing actually occurs is hereinafter referred to as the "**Closing Date**." The Closing shall be effective as of 11:59 p.m. Eastern Time on the Closing Date.

**ARTICLE II**
**REPRESENTATIONS OF THE SELLER**

In order to induce the Buyer to enter into this Agreement, the Seller hereby makes the representations and warranties set forth below, which are true, correct and complete on the date hereof (unless specified in such representation or warranty to be true, correct, and complete only as of the Closing) and shall be true, correct, and complete as of the Closing. The Seller has delivered to the Buyer the Disclosure Schedule on the date hereof. Except as set forth in those sections of the Disclosure Schedule corresponding to the sections below:

## 2.1 **Execution and Delivery**

The execution, delivery, and performance of this Agreement and any related agreements by the Seller and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Seller, and no other action on the part of the Seller is necessary to authorize the execution, delivery, and performance of this Agreement and any related agreements by the Seller and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by the Seller and constitutes the legal, valid, and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, assuming valid execution and delivery of this Agreement and the Related Agreements by the Buyer, and except as enforceability may be limited by bankruptcy, insolvency, reorganizations, moratorium, or other Laws affecting creditors' rights generally.

## 2.2 **Assets**

**(a)** The Seller owns, leases, or has the legal right to use the Purchased Assets, used or intended to be used in the conduct of the Business, and, with respect to contract rights, is a party to and enjoys the right to the benefits of all contracts, agreements, and other arrangements used or intended to be used by the Seller (as such relate to the Business) or in or relating to the conduct of the Business, all of which properties, assets, and rights constitute Purchased Assets except for the Retained Assets.

**(b)** The Seller has good and marketable title to, or, in the case of leased or subleased Purchased Assets, valid and subsisting leasehold interests in, all the Purchased Assets, free and clear of all Liens.

**(c)** The Seller has the complete and unrestricted power and unqualified right to sell, assign, transfer, convey, and deliver the Purchased Assets to the Buyer without penalty or other adverse consequences. Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, the Buyer will own, with good, valid, and marketable title, or lease, under valid and subsisting leases, or otherwise acquire the interests of the Seller in the Purchased Assets, free and clear of any Liens and without incurring any penalty or other

3

adverse consequence, including any increase in rentals, royalties, or license or other fees imposed as a result of, or arising from, the consummation of the transactions contemplated by this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

In order to induce the Seller to enter into this Agreement, the Buyer hereby makes the representations and warranties set forth below which are true, correct, and complete on the date hereof and shall be true, correct, and complete as of the Closing.

### 3.1 <u>Organization</u>

The Buyer is a Texas corporation duly organized, validly existing, and in good standing under the laws of the State of Texas. The Buyer has full organizational power, authority, and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

### 3.2 <u>Execution and Delivery</u>

The execution, delivery, and performance of this Agreement and any related agreement by the Buyer and the consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by the Buyer, and no other action on the part of the Buyer is necessary to authorize the execution, delivery, and performance of this Agreement and any related agreements by the Buyer and the consummation of the transactions contemplated hereby and thereby (other than the approval of the board of directors of the Buyer's). This Agreement has been duly and validly executed and delivered by the Buyer and constitutes, and upon the execution and delivery by the Buyer of any related agreements, the related agreements will constitute, legal, valid, and binding obligations of the Buyer, as the case may be, enforceable against the Buyer in accordance with their terms, assuming valid execution and delivery of this Agreement and the related agreements by the Seller, and except as enforceability may be limited by bankruptcy, insolvency, reorganizations, moratorium, or other Laws affecting creditors' rights generally.

### 3.3 <u>Authority</u>

The Buyer has full organizational power and authority to conduct its business as and to the extent now conducted and to own, use, and lease its assets and properties.

## ARTICLE IV
## CONDITIONS TO CLOSING

### 4.1 <u>Conditions to Obligation of the Buyer to Close</u>

The obligation of the Buyer to affect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of each of the following conditions:

**(a)** <u>**Representations and Warranties**</u>. The representations and warranties of the Seller contained in this Agreement (i) that are not qualified by "materiality" or "Material Adverse Effect" shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date with the same force and effect as if made as of the Closing Date and (ii) that are qualified by "materiality" or Material Adverse Effect" shall have been true and correct when made and shall be true and correct as of the Closing with the same force and effect as if made of the Closing Date, except to the extent such representations and warranties are as of another date, in which case, such representations and warranties shall be true and correct as of that date with the same force and effect as if made as of the Closing Date and except in the case of clause (ii) above for such failure of such representations and warranties to be true and correct that would not have, individually or in the aggregate, a Material Adverse Effect.

**(b)** <u>**Observance and Performance**</u>. The Seller shall have performed and complied with all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, including the execution and delivery of any related agreements.

**(c)** <u>**No Legal Actions**</u>. No Governmental Authority shall have issued an order not subsequently vacated, restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement. The Seller shall have obtained all regulatory approvals necessary from each Governmental Authority, if any as applicable, to transfer all of the Purchased Assets to the Buyer.

**(d)** <u>**Proceedings**</u>. All proceedings and actions taken in connection with the transactions contemplated hereby and all certificates mentioned herein or incident to any such transaction shall be reasonably satisfactory in form and substance to the Buyer and its counsel.

**(e)** <u>**Liens**</u>. All Liens relating to the Purchased Assets shall have been released in full and the Seller shall have delivered to the Buyer written evidence, in form satisfactory to the Buyer in its reasonable sole discretion, of the release of such Liens, if any.

**4.2** <u>**Conditions to Obligations of the Seller to Close**</u>

The obligations of the Seller to affect the closing of the transactions contemplated by this Agreement are subject to the satisfaction prior to or at the Closing of the following conditions:

**(a)** <u>**Representations and Warranties**</u>. To the best of its knowledge and belief the representations and warranties of the Buyer contained in this Agreement shall have been true and correct when made and shall be true and correct in all material respects as of the Closing, except to the extent such representations and warranties are as of another date, in which case, such representations and warranties shall be true and correct as of that date, in each case, with the same force and effect as if made as of the Closing, other than such representations and warranties as are made as of another date;

**(b)** <u>**Observance and Performance**</u>. The Buyer shall have performed and complied with all material covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date.

**(c)** <u>**No Legal Actions**</u>. No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement. No person, firm, corporation, or governmental agency shall have instituted an Action or Proceeding which shall not have been previously dismissed seeking to restrain, enjoin, or prohibit the consummation of the transactions contemplated by this Agreement or seeking damages with respect thereto.

**(d)** <u>**Closing Documents**</u>. The Seller shall have received such further instruments and documents,

normal and customary for transactions such as those contemplated by this Agreement, as may be reasonably required for the Seller to consummate the transactions contemplated hereby.

## ARTICLE V
## COVENANTS

**5.1**   **Conduct of the Seller, the Business, and the Purchased Assets Pending the Acquisition**

The Seller agrees that, from the date hereof until Closing, except to the extent that the Buyer shall otherwise consent in writing:

**(a)** the Seller shall (i) operate the Business and the Purchased Assets in the ordinary course of business consistent with past practice and use its reasonable best efforts to preserve intact its present business organizations and relationships with persons having business relationships with it; (ii) maintain all of the Purchased Assets in substantially the same condition as such Purchased Assets exist on the date hereof, ordinary wear and tear excepted; and (iii) insure all of the Purchased Assets in such amounts and of such kinds comparable to that in effect on the date hereof, to the extent available at current premiums.

**(b)** except in the ordinary course of business, the Seller shall not enter into, materially amend, or renew, or waive or release any rights of material value under, any of the Assigned Contracts (including capital leases and contracts for the purchase and/or sale of capital equipment) or Assigned Leases;

**(c)** the Seller shall not grant any Lien (except a Permitted Lien) on any of the Purchased Assets or allow any such Lien (except a Permitted Lien) to occur or to be created;

**5.2**   **Access to Information**

**(a)** From the date hereof until the Closing, upon reasonable notice, the Seller shall cause its employees, agents, representatives, accountants, and counsel to: (i) afford the officers, employees, agents, accountants, counsel, financing sources, and representatives of the Buyer reasonable access, during normal business hours, to the offices, properties, plants, other facilities, books and records of the Seller relating to the Business, including access to enter upon such properties, plants, and facilities and to those officers, directors, employees, agents, accountants, and counsel of the Seller who have any Knowledge relating to the Business and (ii) furnish to the officers, employees, agents, accountants, counsel, financing sources, and representatives of the Buyer such additional financial and operating data and other information regarding the assets, properties, liabilities, and goodwill of the Business (or legible copies thereof) as the Buyer may from time to time reasonably request.

**5.3**   **Notification of Certain Matters**

Subsequent to the date of this Agreement and on or prior to the Closing, the Seller, on the one hand, and the Buyer on the other, shall each promptly notify the other of:

**(a)** the receipt of any notice of, or other communication relating to, a default or event which, with notice or lapse of time or both, would become a default under any of the Assigned Contracts or Assigned Leases or any other agreement by which the Purchased Assets are bound;

**(b)** the receipt of any notice or other communication from any third party whose consent or approval is or may be required in connection with the transactions contemplated by this Agreement or the Related Agreements, denying such consent or approval;

**(c)** the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated hereby;

**(d)** any event or events which individually or in the aggregate would have a Material Adverse Effect on the Purchased Assets; or

**(e)** any condition or fact which would not permit either of them to satisfy a condition to the other's obligation to effect the transactions contemplated hereby, or any event or condition known to or discovered by them, as applicable, which if it existed on the date of this Agreement or on the Closing Date, would result in any of the representations and warranties of the applicable Party contained herein being untrue.

## ARTICLE VI
## TERMINATION

**6.1** <u>**Termination**</u>

This Agreement may be terminated at any time prior to the Closing Date by mutual consent of the Buyer and the Seller;

## ARTICLE VII
## MISCELLANEOUS

**7.1** <u>**Expenses**</u>

Whether or not the transactions contemplated hereby are consummated, all costs and expenses (including without limitation the fees and expenses of investment bankers, attorneys, and accountants) incurred in connection with this Agreement and any related agreement and the transactions contemplated hereby and thereby shall be borne by the Buyer, in the case of costs and expenses incurred by the Buyer; and by the Seller in the case of costs and expenses incurred by the Seller.

**7.2** <u>**Notices**</u>

All notices, requests, claims, demands, and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given, if given) by hand delivery, transmitted by telegram, email, or telecopy or mailed by registered or certified mail, postage prepaid, return receipt requested to the registered agent for the Parties.

**7.3** <u>**Amendments**</u>

No supplement, modification, or waiver of this Agreement shall be binding unless executed in writing by all of the Parties.

**7.4** <u>**Waiver**</u>

At any time prior to the Closing, the Buyer or the Seller may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the obligations of the other Party or any of the conditions to its own obligations contained herein to the extent permitted by law. Any such waiver or extension shall be effective and valid only if reduced to writing by the Party entitled to provide such extension or waiver. The failure of a Party to exercise any right or remedy shall not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement or any related agreements shall be deemed or shall constitute a waiver of any other provision hereof or thereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided. No course of dealing between or among any Persons having any interest in this Agreement shall be deemed effective to modify, amend, or discharge any

part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.

**7.5**    **Headings**

The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**7.6**    **Jurisdiction; Waiver of Jury Trial**

(a)    Each of the Parties hereby irrevocably and unconditionally submits to the jurisdiction of the state courts in and for Baldwin County, Alabama and irrevocably agrees that all actions or proceedings arising out of or relating to this Agreement or the transactions contemplated hereby shall be litigated exclusively in such courts. Each of the Parties agrees not to commence any legal proceedings related hereto except in such courts. Each of the Parties irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any such proceeding in any such court and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    EACH OF THE PARTIES HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION RELATED TO OR ARISING OUT OF THIS AGREEMENT OR ANY RELATED DOCUMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY.

**7.7**    **Successors and Assigns**

This Agreement and all of the covenants and agreements contained herein and rights, interests, or obligations hereunder, by or on behalf of any of the Parties, shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties whether so expressed or not, except that neither this Agreement nor any of the covenants and agreements herein or rights, interests, or obligations hereunder may be assigned or delegated by Seller prior to or after the Closing, without the prior written consent of Buyer. Buyer may assign its rights and obligations hereunder (including Buyer's right to purchase the Purchased Assets), in whole or in part, to any of its Affiliates without the consent of any of the other Parties. In addition, Buyer may assign its rights and obligations pursuant to this Agreement, in whole or in part, in connection with any disposition or transfer of all or any portion of the Business in any form of transaction without the consent of the Seller. Buyer may assign any or all of its rights pursuant to this Agreement, including its rights to indemnification, to any of its respective lenders as collateral security.

**7.8**    **Counterparts**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but together shall constitute the same instrument; and signatures delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, shall be given the same legal force and effect as original signatures.

**7.9**    **Governing Law**

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Alabama, without regard to its conflicts of law rules.

**7.10**    **Entire Agreement**

This Agreement and the exhibits and schedules hereto and the Related Agreements constitute the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. There are no warranties, representations, or other agreements between the Parties in

connection with the subject matter hereof except as set forth specifically herein or contemplated hereby.

**7.11    Enforcement Costs**

If any civil action, arbitration, or other legal proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorneys' fees, court costs, sales and use taxes, and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs, and expenses incident to arbitration, appellate, bankruptcy, and post-judgment proceedings), incurred in that proceeding, in addition to any other relief to which such Party or Parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes, and all other charges billed by the attorney to the prevailing Party (including any fees and costs associated with collecting such amounts).

**7.12    Severability**

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**7.13    Interpretation**

The headings and captions used in this Agreement, in any Schedule or Exhibit hereto, in the table of contents or in any index hereto are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement or any Schedule or Exhibit hereto, and all provisions of this Agreement and the Schedules and Exhibits hereto shall be enforced and construed as if no caption or heading had been used herein or therein. Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement. Each defined term used in this Agreement shall have a comparable meaning when used in its plural or singular form. The use of the word "including" (or definitions thereof) herein shall mean "including without limitation" and, unless the context otherwise required, "neither," "nor," "any," "either," and "or" shall not be exclusive. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which such Party has not breached shall not detract from or mitigate the fact that such Party is in breach of the first representation, warranty, or covenant. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**7.14    No Third-Party Beneficiaries**

Except for the Buyer Indemnitees and the Seller Indemnitees, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the Parties and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

**7.15    Specific Performance**

The Seller acknowledges and agrees that Buyer would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the Seller could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which Buyer may be entitled, at law or in equity, it shall

9

be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary, and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

**7.16    Remedies Cumulative**

No remedy in this Agreement conferred upon any Party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any Party of any right, power, or remedy under this Agreement shall preclude any other or further exercise thereof.

**7.17    Terms**

Terms may be defined elsewhere in the text of this Agreement and shall have the meaning indicated throughout this Agreement.

**7.18    Other Definitional Provisions.**

(a)    The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not any particular provision of this Agreement.

(b)    The terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa.

(c)    The terms defined in the neuter or masculine gender shall include the feminine, neuter and masculine genders, unless the context clearly indicates otherwise.

*[Signature page follows]*

10

This Agreement has been duly executed and delivered by the duly authorized officers of the Buyer and the Seller on the date first above written.

**BUYER:**

**DISTRIBUTED LEDGER, INC.,** a Texas corporation

By: _____

Name: John Michael Francis, II

Title: President/CEO

**SELLER:**

**NEW GREEN NETWORK, LLC,** a Wisconsin limited liability company

By: _____

Name: _____

Title: _____



**distributed ledger**

Crypto Mining Tools

**Crypto Mining Tools Acquired by DLI**

Distributed Ledger Inc (DLI) has purchased the assets of New Green Network LLC (Crypto Mining Tools) & I'm now a shareholder in DLI.

On the outside, nothing much will change. Crypto Mining Tools will still be helping you buy and sell new and used bitcoin mining equipment and find cheap hosting and power for your miners. But, now, I'll have the backing of a multi-million dollar company & a much larger team behind me.

Together, Crypto Mining Tools and DLI plan to offer a whole array of blockchain, mining and crypto products and services. Already, DLI offers blockchain infrastructure services, custom blockchain app development & miner hosting. I will be joining their team as the Director of Asset Management.

It has been a pleasure growing in this wild industry along with all of my customers, vendors and colleagues. I look forward to continue helping you acquire mining equipment & getting your miners placed in a good home.

~ Scott Offord
**Crypto Mining Tools**
*Powered by DLI*

1.2K 👁 Scott Offord, 18:13

1 Comment •

C-1



Earn a valuable career credential from the world's leading experts.

SPONSORED BY COURSERA    See More



yahoo/ · Malwarebytes
**Remove malware on your computer**
Get protection now



CISION

# Distributed Ledger, Inc. Has Acquired Crypto Mining Tools, an Industry-Leading Cryptocurrency Mining Hardware Supplier

December 29, 2020 · 1 min read

ATLANTA, Dec. 29, 2020 /PRNewswire/ — Today, Distributed Ledger, Inc. (DLI), a blockchain technology service provider, announced the brand and business acquisition of North American-based cryptocurrency mining hardware supplier, Crypto Mining Tools (CMT). Cryptomining tools is a well-known industry leader in cryptocurrency mining hardware brokerage and the creator of many trusted free online tools for miners.

Distributed Ledger, Inc., a blockchain technology service provider acquires Crypto Mining Tools.

These tools include a hosting provider directory, a bitcoin mining profitability calculator, an in-depth ASIC mining hardware comparison chart, educational YouTube videos, and the Crypto Mining Tools Podcast. With this acquisition, DLI is excited to welcome CMT's founder, Scott Offord, as the company's Director of Asset Management. Scott will leverage this new role to continue the outstanding work and relationships he has built with Crypto Mining Tools.

**What's to Come Over the Next Few Months**

- Re-branding of Crypto Mining Tools
- Re-launch of the Crypto Mining Tools Podcast
- A new look and message behind DLI's Fracking Miner
- Begin scaling services for CMT's customers

**About Distributed Ledger, Inc.:** DLI is a blockchain technology company with offices throughout the Southeastern United States, including Alabama, Georgia, Texas, Arizona, and Wisconsin. Contact info@distributedledgerinc.com for more information.

**About Crypto Mining Tools:** Crypto Mining Tools is a well-known cryptocurrency mining hardware, supporting equipment supplier and colocation broker.

Cision

View original content:http://www.prnewswire.com/news-releases/distributed-ledger-inc-has-acquired-crypto-mining-tools-an-industry-leading-cryptocurrency-mining-hardware-supplier-301198270.html

SOURCE Distributed Ledger Inc

**TRENDING**

Trump releases statement trashing McConnell for not passing infrastructure while na...
Business Insider · 2 min read


Don Lemon sends legal letter to Megyn Kelly
TheGrio · 3 min read


22-year-old Texas A&M student suffered multiple heart attacks and isn't showing brain activity...
INSIDER · 2 min read


It feels harder and harder to not share my truth: Bella Hadid gets real about her mental health
Yahoo Canada Style · 4 min read


Buttigieg responds to Ted Cruz on racism in highway design
Yahoo News · 2 min read

**Fast speeds. Smooth streaming.**

xfinity



**POPULAR**



Latest weather with Leslie Lopez
KABC – Los Angeles



C-2

**Natalie Leon**

| | |
|---|---|
| **From:** | Josh Koch |
| **Sent:** | Friday, November 19, 2021 10:25 AM |
| **To:** | Natalie Leon |
| **Subject:** | FW: DLI/OFFORD |

**From:** Josh Koch
**Sent:** Monday, November 8, 2021 9:34 PM
**To:** 'Michael Brandwein' <michaelb@gordonlawltd.com>
**Cc:** Dennis Green <dennis@lawofficeofdennisgreen.com>; Mike Francis <mfrancis@wavefly.com>
**Subject:** RE: DLI/OFFORD

Michael – DLI is  open to settlement discussions but will not have any discussions until your clients transfer administrative control of the cryptomining.tools domain and Telegraph groups. So long as they continue to hold these domains hostage there is nothing to discuss.
Josh

**R. JOSHUA KOCH**
Partner
JKoch@KochSchmidt.com
T: 504.208.9042/ F: 504.208.9041
C: 337.344.5482

**KOCH & SCHMIDT, LLC**
650 Poydras St./Suite 2660/New Orleans, LA/ 70130
www.kochschmidt.com

CONFIDENTIAL STATEMENT
This message is sent by a law firm and may contain information that is privileged or
confidential.  If you receive this transmission in error, please notify the sender by reply email and delete the message and any attachments.

**From:** Michael Brandwein <michaelb@gordonlawltd.com>
**Sent:** Monday, November 8, 2021 6:41 PM
**To:** Josh Koch <JKoch@kochschmidt.com>
**Cc:** Dennis Green <dennis@lawofficeofdennisgreen.com>; Mike Francis <mfrancis@wavefly.com>
**Subject:** Re: DLI/OFFORD

Josh,

My client would be happy to address your concerns if you are willing to reduce this to writing in exchange for a mutual release between all parties/covenant to sue and compliance with his previous request to receive compensation owed to him and the personal belongings referenced in the previous email (in addition to either purchasing the equipment

1

D

pursuant to the invoice or returning it). He is very concerned about the lack of attention to his compensation being paid and belongings that are still on site.

Best,

--------------------------------
MICHAEL BRANDWEIN, ESQ.
SENIOR ATTORNEY

GORDON LAW GROUP, LTD.
400 CENTRAL AVE., SUITE 340
NORTHFIELD, IL 60093

The information contained in this electronic mail message, including any attachments, is confidential, may be privileged and is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522. Unauthorized use, copying or distribution of this message, including any attachments, is strictly prohibited and may be unlawful. If this message was sent to you in error, please notify the sender by return email and destroy this message, including any attachments.

Any tax advice contained in this communication was not intended or written to be used, and cannot be used, to rely on for the purpose of avoiding any penalties that may be imposed by any governmental taxing authority.

On Mon, Nov 8, 2021 at 4:24 PM Josh Koch <JKoch@kochschmidt.com> wrote:

Michael – we are  disappointed that we have had no reply to our email below and conclude your clients have no intention of transferring administrative control of the cryptomining.tools domain to DLI. We will notify DLI of your client's position and will proceed accordingly.

Kind regards.

Josh

**R. JOSHUA KOCH, JR.**

Partner

JKoch@KochSchmidt.com

T: 504.208.9042/ F: 504.208.9041

**KOCH & SCHMIDT, LLC**

650 Poydras St./Suite 2660/New Orleans, LA/ 70130

www.kochschmidt.com

2

CONFIDENTIAL STATEMENT

This message is sent by a law firm and may contain information that is privileged or

confidential. If you receive this transmission in error, please notify the sender by reply email and delete the message and any attachments.

**From:** Josh Koch
**Sent:** Friday, November 5, 2021 7:38 PM
**To:** Michael Brandwein <michaelb@gordonlawltd.com>
**Cc:** Dennis Green <dennis@lawofficeofdennisgreen.com>; Mike Francis <mfrancis@wavefly.com>
**Subject:** Re: DLI/OFFORD

Hi Michael. We would be happy to discuss your email but we must first insist that your client transfer administrative control of the cryptomining.tools domain to DLI. It's clear he sold the domain to DLI and took the company's stock in consideration. We have confirmed that not only has he refused to transfer administrative control to the domain, terminated DLI employees access to the domain, but is holding himself out to the public and DLIs customers as the owner of the site. As Dennis has previously pointed out to you or your client, there appear to be both civil and criminal consequences to these actions. If he wants to move forward with amicable discussions he must immediately transfer administrative control.

Let us know what he wants to do. He is at the end of the runway.

Kind regards.

Josh

R. JOSHUA KOCH, JR

Partner

JKoch@KochSchmidt.com

T: 504-208-9040 C: 337-344-5482

On Nov 5, 2021, at 6:30 PM, Michael Brandwein <michaelb@gordonlawltd.com> wrote:

Josh,

3

Can you or Dennis address my previous email to Dennis from the other week? We can discuss any other issues thereafter.


Best,

---------------------------------
MICHAEL BRANDWEIN, ESQ.
SENIOR ATTORNEY

GORDON LAW GROUP, LTD.
400 CENTRAL AVE., SUITE 340
NORTHFIELD, IL 60093

The information contained in this electronic mail message, including any attachments, is confidential, may be privileged and is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2522. Unauthorized use, copying or distribution of this message, including any attachments, is strictly prohibited and may be unlawful. If this message was sent to you in error, please notify the sender by return email and destroy this message, including any attachments.

Any tax advice contained in this communication was not intended or written to be used, and cannot be used, to rely on for the purpose of avoiding any penalties that may be imposed by any governmental taxing authority.




On Thu, Nov 4, 2021 at 1:11 PM Josh Koch <JKoch@kochschmidt.com> wrote:



Michael – I am following up on a voicemail I left you a short while ago.


As I stated in my vm I am co-counsel with Dennis Green working for Distributed Ledger ("DLI") in connection with their multitude of claims against your client, Scott Offord. Offord, as the administrator for the Cryptomining.tools domain ("CMT"), intentionally and maliciously terminated access of DLI employees to their CMT emails thereby interfering with and frustrating their communications with customers and potential customers to the detriment of DLI and to the benefit of Offord. All company sales efforts and most its marketing were run through this domain instead of DLI channels at the insistence of Offord.

The purpose of today's vm and this email is to respectfully make demand on Mr. Offord to immediately (like today), reinstate access to DLI employees to the CMT domain and to transfer administrative control of the domain to DLI. As you are aware, the domain was sold to and belongs to DLI. We understand from Google that we may be able to transfer administrative control if we are provided the email address that was used by Mr. Offord to open the account. Accordingly, if Mr. Offord will provide this information we will make an initial attempt to confect the transfer without Mr. Offord's further involvement. Of course, if this is not successful, we fully expect Mr. Offord to promptly undertake such efforts as are necessary to effect the transfer.

We look forward to discussing this and related matters with you.

Kind regards.

Josh Koch

## AFFIDAVIT of JAMES ANDERSEN

STATE OF MICHIGAN                  )

COUNTY OF DELTA                   )

     I, James Andersen, of full age, being duly sworn according to law, upon his oath, deposes and says that:

1)     I am Vice President of Operations of Distributed Ledger, Inc. ("DLI").

2)     As Vice President, I am familiar with the employment and termination of Scott Offord, as well as sales and marketing by DLI.

3)     On or about early December, 2020, DLI purchased the Assets of New Green Network, LLC ("NGN"), a company believed by me to be solely owned and managed by Scott Offord. NGN was paid one millions shares of DLI stock for the sale of its Assets. The stock has been placed in the name of Scott Offord who was also designated the Asset Management Director of DLI over the Assets purchased from NGN. The purchased Assets include, among other, the cryptomining.tools domain, Telegram channels, and NGN customer and vendor lists.

4).     Following its acquisition of the Assets, DLI began using the cryptomining.tools and Telegram channels as its primary means of communication and marketing.

5).     On or about October 28, 2021, Scott Offord, terminated access of DLI to its cryptomining.tools domain and to DLI's Telegram channels purchased from NGN. It is my understanding that despite the sale of the Assets to DLI, Offord retained "administrative" control of the domain and Telegram channels. Numerous requests have been made of Defendants to restore access to the domain and Telegram channels but were ignored or refused.

**E**

5.     Offord was terminated from DLI on October 28, 2021 following his hijacking of the cryptomining.tools domain and Telegram channels. Since his termination, DLI has experienced a significant drop in communications from clients and sales. In addition, DLI learned that Offord redirected repair services previously provided by DLI to another entity in which he is believed to have an interest.

6.     On information and belief, Offord is believed to be using DLI proprietary and confidential information obtained during his employment with DLI, including customer and pricing details, to negotiate on his own behalf a contract with a primary vendor of DLI. Offord was instructed by DLI during his employment to negotiate with this vendor for a contract on DLI's behalf. For reasons only now becoming clear, Offord delayed contacting the vendor resulting in DLI losing the contract and has now negotiated his own contract with the vendor. DLI has since been informed that the vendor is unable to provide to DLI the products requested for any additional contracts.

7)     Offord was also recently discovered to have contacted DLI's Chinese vendor and instructed the vendor to "redirect" certain items that he had previously ordered on DLI's behalf for one of its customers, to himself for one of his customers. DLI was therefore unable to complete its customer's order for this equipment.

8)     Offord has also refused to provide the management, marketing and communication records relating to the cyptomining.tools domain and brand use.

9)     DLI is and will continue to suffer a loss of customers, vendors and good will if defendants are not ordered to immediately transfer and assign to DLI all rights as administrator to the cryptomining.tools domain and all Telegram channels, to forward to

DLI all communications to or from the domain and Telegram channels that have been obstructed by Defendants, to refrain from further obstructions of Plaintiff's access to its cryptomining.tools domain and Telegram channels, and to refrain from the use of any customer, contract, vendor or other confidential and proprietary information or documents made available to or obtained by Defendants during his employment as the Asset Management Director of DLI.

I have read and signed the above on this 19th day of November, 2021.


JAMES ANDERSEN


SWORN TO AND SUBSCRIBED before me on this 19th day of November, 2021.


Heidi M Bullen

NOTARY PUBLIC

My Commission Expires: 2-1-24

HEIDI M. BULLEN
NOTARY PUBLIC, STATE OF MI
COUNTY OF DELTA
MY COMMISSION EXPIRES Feb 1, 2024
ACTING IN COUNTY OF

< **Message**

Group message

 **Nathan Letteney**
Oct 28th at 12:06 PM

My CMT email was just shut off, it is ran on Scott's personal server at offord.me

This where I receive forwarded emails from sales@cryptomining.tools, and is also on my business cards nate@cryptomining.tools (edited)

### Google

## Your account has been disabled

 nate@offord.me ⌄

Your Google Account was disabled by your Google Workspace administrator. Contact your administrator for help.

Reply in thread

F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DISTRIBUTED LEDGER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 21-0490-KD-N |
| | ) | |
| NEW GREEN NETWORK LLC, | ) | |
| MILWAUKEE SEO LLC, and | ) | |
| SCOTT OFFORD, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This action is before the Court on Plaintiff Distributed Ledger, Inc.'s (DLI) Motion for

Temporary Restraining Order and Preliminary Injunction and brief in support (docs. 9; 9-1).

Accordingly, Defendants New Green Network LLC, Milwaukee SEO LLC, and Scott Offord shall

file their **response** on or before **December 10, 2021.** The Motion is set for **hearing** on **December**

**21, 2021, at 10:00 a.m.** in Courtroom 4B of the United States Courthouse, 155 St. Joseph Street,

Mobile, Alabama 36604.

DONE and ORDERED this the 23rd day of November 2021.

**/s/ Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**