## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

DISTRIBUTED LEDGER, INC          *

              Plaintiff,  *

v.                               *    CASE NO.: 1-21-CV-490

NEW GREEN NETWORK LLC,           *
MILWAUKEE SEO LLC, and SCOTT     *
OFFORD                           *

             Defendants.

## AMENDING, SUPPLEMENTAL AND RESTATED COMPLAINT FOR PRELIMINARY INJUNCTION, DECLARATORY RELIEF, DAMAGES, AND ATTORNEY FEES

NOW COMES, Plaintiff, Distributed Ledger Inc. ("DLI," "Company," or "Plaintiff"), by and through its undersigned counsel of record, and respectfully submits this Amending, Supplemental and Restated Complaint against the defendants, New Green Network LLC ("NGN"), Milwaukee SEO LLC ("Milwaukee SEO") and Scott Offord ("Offord") and states and alleges the following:

## PARTIES

**1.**

Plaintiff, DLI, is and was at all times material, a corporation organized and existing under the laws of the State of Texas with its registered office at 5223 Pointe Spring Xing, Texas 77389 and its headquarters and principal place of business in Daphne, Alabama.

**2.**

Defendant NEW GREEN NETWORK, LLC ("NGN") is and was at all times material, a limited liability company organized and existing under the laws of the State of Wisconsin with its principal place of business in Milwaukee, Wisconsin.

1

**3.**

Defendant, MILWAUKEE SEO, LLC ("Milwaukee SEO") is a limited liability company organized and existing under the laws of the State of Wisconsin with its principal place of business in the State of Wisconsin and was at all times material the registered agent of NGN.

**4.**

Defendant, SCOTT OFFORD, is and was at all times material, an individual residing and domiciled in the State of Wisconsin.

**5.**

Defendant, SCOTT OFFORD, is and was, on information and belief, at all times material, the sole member and officer of New Green Network, LLC and Milwaukee SEO, LLC.

**6.**

Defendant, SCOTT OFFORD, is and was, on information and belief, at all time material, the sole member and registered agent of Milwaukee SEO, LLC.

**7.**

Defendants, NGN, Milwaukee SEO and Scott Offord, are and were, on information and belief, at all times material, the ALTER EGO of the other and conspired together to undertake the acts complained of below.  Defendants are referred to collectively hereafter as "Offord."

**JURISDICTION AND VENUE**

**8.**

This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  Complete diversity of citizenship exists between plaintiff (a corporation incorporated in Texas with its principal place of business in Alabama) and defendants (an individual domiciled and residing in Wisconsin and two limited liability companies, each of which was formed under

the laws of Wisconsin, has its principal place of business in Wisconsin, and has, as its sole member, an individual residing and domiciled in Wisconsin.) The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

**9.**

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because the parties entered into contracts which required performance to take place, in part, in this District;  this dispute arose out of acts which occurred, in part, in this District causing damages which were suffered, in part, in this District; and, additionally, because the parties entered into contracts containing choice of forum clauses which identify any court in Baldwin County, Alabama as an acceptable forum.

## FACTUAL BACKGROUND

**10.**

Cryptocurrency is in its simplest form a digital currency created through the use of electronic "miners". Transactions using this currency are recorded on a digital ledger maintained by blockchain service providers.

**11.**

DLI is a blockchain technology service provider with an infrastructure designed to support the blockchain ecosystem and the latest technological advancements. Its services include mining efforts, mining as a service, hardware sales, facility design and management, repair, servicing, and maintenance. DLI provides blockchain network infrastructure hosting and support on a proprietary, secure cloud environment. DLI's customer base includes governments, enterprise corporations and private entities.

**12.**

New Green Networks ("NGN") was formed by Offord in or around January, 2018 to provide sales and services to the crypto industry. Its products included Computing Equipment (miners from various vendors), Hardware, Software, Cables, and PDUs (power distribution unit). To facilitate its sales and service, NGN owned various marketing lists, specific channels for sales and services in Telegram, Wechat, among other social media websites.

**13.**

NGN was at all times operated under the brand name cryptomining.tools ("CMT")

**14.**

At some point in approximately 2020, NGN was faced with financial difficulty as the result of sales of equipment to customers which was paid for but never delivered due to what was described by Offord as a "supplier issue" with a Chinese supplier.

**15.**

After learning of NGN's potential demise, DLI communicated to Offord its interest in acquiring NGN's assets to: 1. expand its miner sales business; 2. expand its PDU and cable sales business; 3. further expand its Sales, Marketing and Operational Services, and to expand its branding and reach across the crypto industries. Negotiations ensued between the parties resulting in Offord's agreement to sell the assets of NGN to DLI, and for him to work as independent contractor with DLI.

**16.**

In an effort to consummate these understandings, four written contracts were prepared. Two of the contracts were signed by the parties (fully executed) and two of the contracts were not

signed but may have become legally effective because the parties' communications and actions, as described hereafter, may have served to render the contracts enforceable.

### 17.

Copies of the four contracts are appended hereto and incorporated herein as Exhibits 1 through 4.   A review of these documents will show the following.

### 18.

Exhibit 1, titled "Asset Purchase Agreement" (also in the record as Document 16-4) is between DLI as the buyer and NGN as the seller.   This agreement was signed on or about December 1, 2020.   NGN agrees to sell and transfer all its assets to DLI as consideration for stock in DLI (500,000 Class A shares and 500,000 Class B shares).

### 19.

The "Assets" to be sold by NGN to DLI included the following:

a.   "Crypto Mining Tools" ("CMT") brand;

b.   Control of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups;

c.   Cryptomining.Tools website, apps and code base;

d.   Crypto Mining Tools Podcast;

e.   New Green Network LLC customer base, user list;

f.   Business development and access to relationships with hardware and software vendors worldwide;

g.   50% ownership in a pending trademark for the phrase "Blockchain Mining" for use in advertisements, magazines, tradeshows, etc.; and

h.   Miner sales business and PDU design and manufacturing relationships.

**20.**

Exhibit 2, titled "Distributed Ledger, Inc. Independent Contractor Agreement" (also in the record as Document 1-3) was signed on the same day as, and shortly after, the Asset Purchase Agreement. The parties are DLI and NGN. NGN agrees to act as an independent contractor to "actively manage" the assets sold and transferred to DLI in return for a salary of $84,000 and other benefits.

**21.**

As noted above, Exhibit 1 calls for DLI to transfer 500,000 Class A shares and 500,000 Class B shares to NGN. A condition of the sale and transfer of the shares was the execution by Offord of Class A and Class B Shareholder Agreements. DLI tendered these two contracts to Offord who did not object to either contract except to state that he would prefer to have the shares placed in the name of Offord's new company, Milwaukee SEO, LLC because he was going to have NGN to cease operations in the near future.

**22.**

At Offord's request, DLI revised the contracts to identify DLI and Milwaukee SEO, LLC as the parties. Copies of these revised contracts are appended hereto as: Exhibit 3 "Distributed Ledger Class A Common Stock Share Agreement" and Exhibit 4: "Distributed Ledger Class B Common Stock Share Agreement".

**23.**

DLI forwarded Exhibit 3 and Exhibit 4 to Offord. Offord did not object to either proposed agreement and failed, and/or refused, to sign or return either agreement. Despite this failure to execute the shareholder agreements, Offord has been publicly holding himself out as a shareholder of DLI and has gone so far as to vote the shares. (See Document 1-2)

**24.**

While the discussions of the share agreements were ongoing, DLI provided Offord (NGN) with the title of "Asset Management Director" and commenced paying the salary called for in the Asset Purchase Agreement.

**25.**

Offord accepted the salary payments.

**26.**

Offord, at all times material, held himself out to DLI, its actual and potential customers, and vendors as Asset Management Director of DLI.

**27.**

During the time of Offord's employment, DLI funded and developed multiple related business units which are now threatened and in jeopardy solely as a result of Offord's recent actions as detailed more fully hereafter. These business units include, but are not limited to, Equipment Sales, Equipment Repairs, Logistics, and Conference Services. The actual and potential damages to DLI are in the tens of millions of dollars.

**28.**

Offord, as Asset Management Director of DLI, was obligated individually and as the owner and agent of NGN to always act in the best interest of DLI and to comply with the obligations and duties undertaken by NGN in its contract with DLI.

**29.**

In addition to his duties of actively managing the assets sold by NGN to DLI, Offord was also responsible for sales and marketing of "miners" on behalf of DLI, and of overseeing and directing DLI marketing and sales and related personnel.

**30.**

Offord, in his execution of the Independent Contractor Agreement (Exhibit 2) covenanted not to take any action opposed to the best interest of DLI, not to take advantage of any corporate opportunity without first offering the opportunity to DLI with full disclosure of the facts, and not to make any unauthorized disclosure or other use of any confidential information while employed or thereafter.

**31.**

DLI, following its acquisition of the Assets from NGN, began to run most of its sales and marketing efforts through its recently acquired cryptomining.tools domain and acquired Telegram channels and groups. Offord, at his insistence as Asset Management Director, retained administrative control of the Telegram channels and domain for cryptomining.tools, and continued to require DLI employees to use his personal server at "offord.me" to gain access to the domain.

**TERMINATION OF OFFORD FOR CAUSE**

**32.**

Subsequent to assuming the title and responsibilities of Asset Management Director, Offord was discovered by DLI to have engaged in, among other, the following conduct in breach of his and NGN's contractual covenants, obligations and duties:

a. Instructed participants in a forthcoming crypto mining conference sponsored by DLI to pay their registration fees for the conference to the bank account of Milwaukee SEO, LLC rather than DLI.

b. Offord, despite the sale to DLI of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups, failed and refused to turn over administrative control of the Telegram groups. Access to this information and control were and are

essential to DLI's marketing efforts and sales leads. On information and belief, other Telegram groups were created by NGN or Offord during his employment with DLI, but never disclosed to DLI, the actual owners of these Telegram groups.

c. Offord, despite the sale to DLI of cryptomining.tools domain and all associated accounts for management, marketing and correspondence, failed and refused to surrender these records, information and administrative control of the domain (G-suite, marketing mailer apps, mailing lists, signup forms, etc.) to DLI converting them to his and own use and benefit.

d. Offord, despite the sale of NGN's customer base, failed and refused to provide an export spreadsheet/list from to DLI. On information and belief, Offord migrated this customer/vendor list to another account held in the name of Milwaukee SEO, LLC, another company owned by Offord.

e. Despite NGN's sale of these assets to DLI, Offord failed and refused to provide to DLI a comprehensive list of hardware and software vendors, suppliers, brokers and contact lists and, on information and belief, converted this list to himself for his own benefit. This refusal has frustrated DLI's access to and relationship with vendors worldwide.

f. Offord, despite his and NGNs' representations and covenants to DLI that NGN was owner of 50% interest in the pending trademark for the phrase " Blockchain Mining", failed and refused to transfer to DLI this 50% interest. On information and belief, this interest was not owned by Offord or NGN and was not theirs to sell.

g. Offord, failed and refused to provide to DLI the design discussions, drawings, and related material for PDU current and future designs, although acknowledging that DLI had acquired these assets in the Asset Purchase Agreement.

h. Offord, as Asset Management Director, routinely exceeded his authority, directing other employees to undertake duties and assignments outside their scope of employment for his personal benefit, including without limitation, demanding that employees perform tasks within his duties, directing employees to take notes for him, as well as summarizing videos and meetings. These ultra vires acts resulted in a hostile work environment for the company's employees.

i. Offord, intentionally and without appropriate authority and in violation of company policy, shipped to a customer of DLI 28 more units than paid for by the customer at a loss to DLI in excess of $150,000. On information and belief, these extra units were shipped to provide goodwill to Offord for his personal benefit.

j. Offord, as Asset Management Director, was responsible for, among other things, negotiating with customers and vendors of DLI. On information and belief, Offord, intentionally and maliciously, interfered with DLI's potential contracts with customers, including without limitation, Bitmain. As a result of his actions and interference, DLI was unable to timely confect a contract with Bitmain resulting in a significant loss to DLI.

k. Offord, while acting as Asset Management Director for DLI, used DLI time, channels, and resources acquired from NGN to sell his/NGN equipment without prior authorization, notification to or coordination from DLI.

l. Offord, while acting as Asset Management Director for DLI, used company time, channels, and resources acquired from NGN to market and sell equipment through another of his companies, Milwaukee SEO, LLC, in competition with and to the detriment of DLI with the intention of creating a back fall of revenue for personal gain.

m. Offord, following his termination from DLI, in violation of applicable law, trespassed on the property of DLI, threatened DLI employees, and stole and/or unlawfully removed property belonging to DLI.

n. Offord, in breach of his duties and for his personal gain, installed video and audio recording equipment, secretly recording the audio conversations of employees and customers of DLI without their knowledge or consent.

o. Offord, as Asset Management Director, without the knowledge or authority of DLI, used miners owned by DLI to generate cryptocurrency at DLI's cost. The currency was placed directly into Offord's personal wallet. Offord also tried to encourage employees who worked under him to do the same.

p. Offord, acting beyond his authority, executed contracts on behalf of DLI with Bitmain for equipment and training operations. These contracts resulted in the loss of considerable time and money to DLI.

q. Charged excessive and inappropriate expenses to his corporate credit card.

r. Transferred mining PDU's to a personal friend without authorization or approval.

s. Instructed clients of DLI to send payment for the purchase of miners from DLI to the bank account of Milwaukee SEO, LLC rather than DLI.

t. Offord, as the administrator for the Cryptomining.tools domain, intentionally and maliciously terminated access of DLI employees to their CMT emails thereby interfering with and frustrating their communications with customers, potential customers and vendors to the detriment of DLI and to the benefit of Offord. All company sales efforts and most its marketing were run through this domain instead of DLI channels at the insistence of Offord.

u. Other acts to be shown at the time of trial.

**33.**

Paragraph 3 of the Independent Contractor Agreement provides, in pertinent part, that Contractor (Offord) may be terminated by DLI ("Corporation") upon 30-day notice unless termination is for Cause, in which event the Notice of Discharge shall state such Cause, and in such event the effective date of termination may, if stated in the notice, be immediate upon giving the notice.

**34.**

Paragraph 6 (d) of the Agreement provides, in pertinent part, that "Cause shall exist if Contractor", among other things:

(2) Willfully engages in conduct demonstrably and materially injurious to the goodwill and reputation of the Corporation;

(5) Without due cause fails within 30 days after receipt of notice to follow any lawful order given by or under direction of the CEO;

(6) Does not correct within 30 days after receipt of notice any act or omission that, in the opinion of the Corporation's legal counsel, gives rise to a cause of action by the Corporation or its Board personally against Contractor to specifically enforce or

restrain some action for purpose of avoiding some loss or damage, or to recover losses or damages, for an amount excess of $10,000.00;

(7) Does not correct within 30 days after receipt of notice any act of dishonesty against the Corporation;

(8) Fails within 30 days of receipt of notice to cure any violations of Contractor's covenants under Section 7;

(9) Intentionally criticizes, ridicules or disparages the Corporation or the Board in any communications or with any customer or client, vendor or supplier, or in any public statement.

**35.**

Paragraph 7 of the Agreement entitled "Contractor Covenants" provides in pertinent part, that:

(a) No Unauthorized Competing Concern. (1) During the term of Contractor's employment and during any Continuation Period, either alone or as a member of a partnership or association, or as an officer, director, advisor, consultant, agent, or employee of any other organization, be engaged in or concerned with any other duties or pursuits requiring Contractor's active personal services that will conflict with Contractor's ability or objectivity in performing Contractor's obligations under this Agreement;

(b) No Disloyal Act. During the term of Contractor's employment, take any action regarding the Corporation, its operations or property, that in good faith Contractor knows or should reasonably know is opposed to the best interests of the Corporation;

13

(c) No Unauthorized Usurpation of Corporation Opportunity. During the term of Contractor's employment, take advantage of any Corporation opportunity without first offering the opportunity with full disclosure of material facts to the Corporation and receiving notice that the Corporation has declined such opportunity. For this purpose, "Corporation Opportunity" means any opportunity to engage in a business activity: (1) Of which Contractor becomes aware (A) by virtue of Contractor's relationship with, or in connection with performing functions in the business of, or in using facilities or other resources of the Corporation, and (B) under circumstances that should reasonably lead Contractor to believe that the person offering the opportunity expects it to be offered to the Corporation; or (2) which Contractor knows is closely related to a business in which the Corporation is engaged or expected to engage;

(d) No Unauthorized Disclosure. During the term of Contractor's employment and thereafter, make or cause to be made any unauthorized disclosure or other use of any confidential information regarding the Corporation or any of its activities and operations, except to the extent reasonably necessary or appropriate in connection with the performance by Contractor of Contractor's authority and responsibility under this Agreement or as may be legally required; provided, however, that nothing herein contained shall preclude the use or disclosure of any information known generally to the public (other than as a result of disclosure by Contractor in violation of this Section 7(d)); and

(e) No Disparagement. During the term of Contractor's employment, criticize, ridicule or make any statement which disparages or is derogatory of the Corporation or any

14

person affiliated with the Corporation in any communications with any customer or client, vendor or supplier of the Corporation or in any public statement.

## 36.

The above acts and others, to be shown at the time of trial, constitute "Cause" for immediate termination as provided under the Independent Contractor Agreement, in that defendant, Offord:

1. Willfully and knowingly engaged in misconduct that has caused significant harm and damage to DLI and its shareholders.

2. Engaged in breaches of his contractual duties to the company.

3. Committed material breaches of the Independent Contractor Agreement including, without limitation, engaging in business in competition with DLI and its company purposes.

4. Provided false and misleading material information to the Company's CEO and COO to disguise his actions.

5. Withheld from DLI material information and records purchased by DLI for his own benefit.

6. Acted on multiple occasions without the requisite approval and authorization of the Company.

7. Usurped and or converted and/or stole property of Company for his own use and benefit.

8. Usurped DLI business opportunities for his own benefit.

9. Maliciously terminated access of DLI employees to the company's Cryptomining.tools domain and website, as well as other Telegram groups and channels

10. Following his termination, Offord redirected repair services from DLI's channels to another party.

11. Used and disclosed confidential Company information including trade secrets and processes.

**37.**

As a result of these and other action, Offord was terminated on or about October 31, 2021, for Cause. Offord has since publicly acknowledged his termination on his Twitter feed.  See Document 1-7.

**POST TERMINATION**

**38.**

Offord, following his termination on or about October 26, 2021, raided DLI's warehouse with three other men. After entering the warehouse, Offord proceeded to remove equipment he claimed was his, equipment owned by a DLI customer, and equipment and miners owned by DLI. During this raid, Offord vandalized equipment in the warehouse, removed keys from the equipment, disconnected much of DLI's operating equipment, shutting down the company's operations and requiring the company to bring in a third-party electrician to repair the damage.

**39.**

Offord, approximately one and a half months after his raid on the warehouse, falsely represented to DLI that he owned a pallet of miners left in the DLI warehouse. The fact of this claim was conveyed electronically by his counsel in Illinois to DLI's counsel in New Orleans and

Houston. This claim is fraudulent. The alleged pallet of miners were not in the warehouse and are believed to have been removed by Offord's group during his raid. This claim constitutes fraud.

**40.**

In or about early January, 2022, Offord contacted Navier, a miner hosting company used by DLI. In his communication, Offord falsely claimed that 34 miners Navier had been hosting for DLI, actually belonged to him and had the miners to him. The value of the miners is believed to exceed $300,000. Only after notifying Offord that he had been caught stealing the miners, did he eventually return the miners to DLI.

**41.**

In or about February, 2022, Offord was discovered to have wrongfully accessed DLI's google drive and stolen proprietary information then used to unlawfully compete against DLI.

**42.**

In or about February, 2022, Offord was also discovered to have arranged for an investigator to create investigative reports on DLI's principals. These reports, presumably containing personal confidential information, were then posted in social media by Offord. In addition to being unlawful, the information in these reports potentially poses security concerns to the DLI personnel. On information and belief, these reports were obtained and posted for the purpose of intimidating DLI and causing harm to its principals.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT (INDEPENDENT CONTRACTOR AGREEMENT)

#### 43.

The averments of Paragraphs 1 through 42 are incorporated by reference herein as if set forth in full below.

#### 44.

The acts complained of above constitute numerous breaches of Offord's contractual duties to DLI.

#### 45.

In his capacity as Asset Management Director, Offord had extensive access to DLI's proprietary and trade secret information and records including, without limitation, its customer base, processes, vendor lists, all of which are subject to rigorous security measures to ensure the information remains confidential and private.

#### 46.

Offord had a contractual duty under the terms of the Agreement, as well as a duty of loyalty under Alabama law not to disclose or improperly use DLI's confidential information for his own benefit and to the detriment of DLI.

#### 47.

In violation of his contractual duties and duty of loyalty to DLI, Offord misappropriated confidential records business information to directly compete with DLI.

**48.**

In further violation of his contractual duties and covenants, Offord has misappropriated the 20,000 subscriber blockchain mining email list and multiple popular Telegram groups and failed and refused to turn over administrative control of any of the Telegram groups. Access to this information and control were essential to DLI's marketing efforts and sales leads. On information and belief, other Telegram groups were also created by Offord while working for DLI, but never disclosed to DLI, the actual owners of these Telegram groups.

**49**.

In further breach of his contractual duties, Offord failed and refused to surrender administrative control of the cryptomining.tools domain (G-suite, marketing mailer apps, mailing lists, signup forms, etc.) to DLI, instead converting them to his own use and benefit. Following his termination from DLI, Offord cut off all access to the domain by DLI employees.

**50.**

Offord has breached, and is continuing to breach, his duties to DLI by way of his misappropriations, theft and continued use of DLI's assets and trade secrets and confidential information for the benefit of himself and others and has thereby caused and continues to cause DLI immediate and irreparable harm as well as damages. Offord's conduct is continuing and deliberate and is causing, and will continue to cause, irreparable harm to DLI.

**51.**

Offord has undertaken a pervasive course of conduct over the past 11 months that has repeatedly breached the contractual covenants contained in the Independent Agreement. Specifically, but not limited to, those outlined above.

**52.**

By virtue of his continued contractual breaches, as pled herein, DLI is entitled to injunctive relief enjoining Offord from continued or further misconduct.

## COUNT II – BREACH OF CONTRACT
## (ASSET PURCHASE AGREEMENT)

**53.**

The averments of Paragraphs 1 through 52 are incorporated by reference herein as if set forth in full below.

**54**.

As previously noted above, NGN agreed to sell all of its assets to DLI in consideration of 500,000 shares of Class A stock and 500,000 shares of Class B stock.

**55.**

As set forth above and hereafter, NGN did not deliver the consideration that was promised to DLI and, to be precise, NGN failed to deliver key assets to DLI and, furthermore, it appears that the Asset Purchase Agreement cannot be enforced as written because NGN did not own some of the assets that NGN promised to deliver.   Offord continued to use assets for his own benefit and profit and, following his termination, retained possession/custody of the assets.

**56.**

Offord, despite receiving the shares of stock from DLI, failed and refused to execute and return the Class A and Class B shareholder agreements which were required to effectuate and complete the transfer of stock.

**COUNT III**
**VIOLATION OF ALABAMA TRADE SECRETS ACT**

**57.**

The averments of Paragraphs 1 through 56 are incorporated by reference herein as if set forth in full below.

**58.**

DLI has developed significant amounts of information about its business systems, processes and methods of operation. DLI has also acquired significant amounts of information from its purchase of the Assets of NGN. As a result of Offord's relationship with DLI and his position as Director of Asset Management, Offord was given access to valuable confidential trade information and trade secrets to facilitate his duties. Such information included, without limitation, all aspects of the confidential and proprietary materials, information, systems, processes, customers and pricing.

**59.**

Pursuant to the Alabama Trade Secrets Act, *Ala. Code § 8-27-1, et seq*, such information constitutes trade secrets because such information is (1) intended for use in DLI's trade and business, (2) is embodied in various compilations, techniques and/or processes used in DLI's business, (3) is not publicly known and is not generally known in the trade, (4) cannot be readily ascertained or derived from publicly available information, (5) is subject to efforts that are reasonable under the circumstances to maintain secrecy, and (6) has significant economic value.

**60.**

Offord was provided such information and materials, or access to such information and materials, with the understanding and agreement that such information and information would not

21

be disclosed and/or used during or following termination of his employment, and has violated and breached the confidence and expectation of loyalty and trust placed in him by DLI. Thus, Offord's willful and malicious misappropriation is actionable pursuant to the Alabama Trade Secrets Act, as DLI has been damaged by such misappropriation. *Ala. Code § 8-27-4.*

**61.**

As a result of Offord's multiple violations of the Alabama Trade Secrets Act, DLI is entitled to injunctive and such other equitable relief as may be appropriate with respect to both his actual and threatened misappropriation of DLI's trade secrets, recovery of all profits and other benefits conferred by the misappropriation that are attributable to the misappropriation, and all actual damages suffered by DLI as a result of the misappropriation.

**COUNT IV**
**FRAUD**

**62.**

The averments of Paragraphs 1 through 61 are incorporated by reference herein as if set forth in full below.

**63.**

Offord, on information and belief, never intended to comply with his obligations or covenants under the Independent Sales Agreement. Rather he, at all times material, intended to use his position as Asset Management Director to divert the company assets and resources to his own use and benefit, including maintaining control of the Assets sold by him to DLI which all times relied on his good faith to their detriment. Offord's actions were made maliciously and with an intent to deceive DLI as a result of which DLI was caused damage as a proximate consequence.

**64.**

As a direct result of his misrepresentations, deception, fraud and deceit, DLI was caused to suffer actual damages for which Offord is liable. As a further result of his actions, Offord is also liable to DLI for punitive damages.

**COUNT V**
**DEFAMATION**

**65.**

The averments of Paragraphs 1 through 64 are incorporated by reference herein as if set forth in full below.

**66.**

Offord, on information and belief, before and following his termination from DLI, falsely communicated to DLI customers, vendors and others in the Crypto Industry that DLI's new sale channels were "fake" as well as other allegations designed solely to harm DLI for his own benefit.

**67.**

The actions of Offord have and are continuing to cause great and irreparable harm to DLI.

**COUNT VI**
**PETITION FOR DECLARATORY JUDGMENT**

**68.**

The averments of Paragraphs 1 through 67 are incorporated by reference herein as if set forth in full below.

**69.**

DLI and Offord disagree as to whether Offord is a stockholder of DLI and entitled to the rights and privileges of a stockholder for the following reasons.

**70.**

The Asset Purchase Agreement (Exhibit 1) calls for DLI to transfer Class A and Class B shares in DLI to Offord in return for consideration specified in the Asset Purchase Agreement. Offord has failed and/or refused to deliver the assets to DLI for which the shares were issued. It is the position of DLI that as a result of failure of consideration, the Asset Purchase Agreement is null and void.

**71.**

Offord also failed and refused to sign and return the Class A and Class B shareholder agreements. It is DLI's position that the issuance of stock was conditioned on execution of the stock share agreements (Exhibits 3 and 4). In the absence of execution of the shareholder agreements, the transfer of stock was not effective.

**72.**

Offord, however, has taken the position that the agreements went into effect such that Offord is an owner of DLI stock and is entitled to exercise the rights of a shareholder of DLI.

**73.**

The result is, there is a dispute between DLI and Offord as to whether Offord has become the owner of DLI stock and as to whether Offord is entitled to exercise the rights of a shareholder.

**74.**

DLI is a Texas corporation. Under Texas law and, specifically, under Tex.Business Organizations Code 1.101 et seq., issues relating to the internal affairs of Texas corporations (including stock ownership) are to be decided under Texas law.   In addition, the two shareholder agreements relating to ownership of common stock (Exhibits 3 and 4) were drafted to include

choice of law provisions which make Texas law applicable.   Thus, irrespective of whether the two agreements (Exhibits 3 and 4) became legally effective or not, Texas law determines whether Offord has an ownership interest in DLI stock.

**75.**

Under Tex. Business Organizations Code § 21.157, the transfer of stock does not become effective until the consideration for the stock is delivered.

**76.**

Since the consideration has not been delivered (and, in fact, it appears that this consideration can never be fully delivered inasmuch as NGN apparently did not own certain of the assets Offord contracted to deliver), DLI's view is, the agreements identified as Exhibits 3 and 4 appended hereto did not become legally effective and cannot become legally effective.  To the extent that DLI representatives have hitherto treated Offord as a stockholder under the mistaken belief that Offord had complied with, or intended to comply with, the parties' agreements, it appears that DLI representatives allowed Offord to assume rights that Offord did not and does not possess.  In DLI's view, DLI is entitled, and legally obligated, to correct its books and records to reflect that Offord is not a stockholder of DLI and Offord not entitled to any right or privilege of a stockholder of DLI.

**77.**

Additionally or alternatively, the actions of Offord are such as to justify rescission of the Asset Purchase Agreement (Exhibit 1) as well as rescission of the stock share agreements (Exhibits 3 and 4) if these agreements became legally effective, and DLI desires rescission of all three agreements and prays for rescission herein. This, again, would authorize and require DLI to correct

its books and records to reflect that Offord is not a stockholder and is not entitled to the rights and privileges of a stockholder of DLI.

**78.**

DLI hesitates to unilaterally take actions which constitute refusing to recognize Offord as a shareholder because of the risk of incurring liability due to a possible violation of shareholder rights in the event that a court might eventually conclude that DLI acted improperly. A shareholder dispute could be injurious to DLI resulting in irreparable harm. Additionally or alternatively, if the agreements became legally effective, then Offord is in breach of the agreements including but not limited to the noncompetition and confidentiality clauses of these agreements (Section 11 Noncompete and Confidentiality) and DLI is entitled to seek damages for these breaches, as well as rescission.

**79.**

Accordingly, DLI respectfully asks this Honorable Court to render a declaratory judgment as follows:

      (i)     Declaring that DLI is entitled to rescission of the Asset Purchase Agreement and declaring this contract to be rescinded (Exhibit 1);

      (ii)    Declaring that the stock share agreements (Exhibit 3 and Exhibit 4) are not, and never have been, in effect as legally enforceable agreements;

      (iii)   Alternatively, if this Honorable Court determines that the stock share agreements (Exhibits 3 and 4) became legally effective, then DLI requests that this Honorable Court declare that DLI is entitled to rescission of these contracts and declaring the contracts to be rescinded;

(iv)     Finally, DLI asks this Honorable Court to declare that Offord is not, and never has been, an owner of DLI stock and Offord is not entitled to be recognized as a stockholder or exercise the rights of a stockholder.

## COUNT VII
## BREACH OF CONTRACT
## STOCK SHARE AGREEMENTS

### 80.

The averments of Paragraphs 1 through 79 are incorporated by reference herein as if set forth in full below.

### 81.

The stock transfer agreements contain noncompetition and confidentiality clauses (Exhibit 3 Section 11, Exhibit 4 Section 11). If these agreements became legally effective, then Offord's conduct breached the non-competition and non-confidentiality clauses, resulting in damages to DLI.   Also, Offord has failed to provide the future services contracted for in Exhibit 4 and has otherwise breached the agreements.

## COUNT VIII
## ACCOUNTING

### 82.

The averments of Paragraphs 1 through 81 are incorporated by reference herein as if set forth in full below.

### 83.

DLI is entitled to an accounting of all transactions by Offord relating to the subject matter of this litigation from the effective date of the Asset Purchase Agreement (Exhibit 1) and the Independent Contractor Agreement (Exhibit 2) to date (from December 1, 2020 to date).

**84.**

More specifically, DLI seeks an accounting of all transactions of Offord under or relating to the subject matter of the contracts, including but not limited to an accounting of all transactions of Offord which involved any use of the employees, premises, equipment, or assets of DLI including intellectual property, including all expenditures, receipts, and profits made by such use. This includes an accounting of all registrants at the February 2022 trade conference and all funds received and expended in connection with this conference.

**85.**

To the extent Offord has profited through use of DLI's employees, premises, equipment or assets of DLI including intellectual property, DLI seeks an accounting of these profits and payment to DLI of these profits.

**REMEDIES, INCLUDING
REQUEST FOR PRELIMINARY
AND PERMANENT INJUNCTIONS AGAINST
OFFORD, NEW GREEN NETWORK AND MILWAUKEE SEO**

**86.**

The allegations and demands of all preceding paragraphs are reaffirmed herein and incorporated by reference.

**87.**

DLI is entitled to, and seeks, relief as follows.

**88.**

DLI is entitled to a declaratory judgment as follows:

(i)  Declaring that DLI is entitled to rescission of the Asset Purchase Agreement and declaring this contract to be rescinded (Exhibit 1);

(ii) Declaring that the stock share agreements (Exhibit 3 and Exhibit 4) are not, and never have been, in effect as legally enforceable agreements;

(iii) Alternatively, if this Honorable Court determines that the stock share agreements (Exhibits 3 and 4) became legally effective, then DLI requests that this Honorable Court declare that DLI is entitled to rescission of these contracts and declaring the contracts to be rescinded;

(v) Finally, DLI asks this Honorable Court to declare that Offord is not, and never has been, an owner of DLI stock and Offord is not entitled to be recognized as a stockholder or exercise the rights of a stockholder.

**89.**

DLI is entitled to and seeks rescissions of the Asset Purchase Agreement (Exhibit 1) and, if the stock share agreements became legally effective, DLI seeks rescission of the stock share agreements (Exhibits 3 and 4).

**90.**

DLI is entitled to and seeks to be made whole for all injuries caused by wrongful acts of Offord. Offord is liable to DLI for actual damages resulting from his contractual breaches and extra contractual wrongful acts, as well as any amounts by which Offord has been unjustly enriched.

**91.**

DLI is entitled to and seeks an accounting of all transactions of Offord relating to the subject matter of this litigation including an accounting and payment to DLI of all profits secured by Offord.

**92.**

DLI is entitled to and seeks exemplary and punitive damages for the wrongful acts of Offord set forth hereinabove inasmuch as such actions were not inadvertent or negligent violations of DLI's legal rights and, to the contrary, Offord engaged in a deliberate, deceptive scheme to wrongfully profit at DLI's expense.

**93.**

DLI is entitled to and seeks reasonable attorney fees and court costs for the prosecution of this action.

**94.**

DLI is entitled to and seeks interest on all amounts due computed according to law.

**95.**

Plaintiff, DLI, pursuant to Rule 65 of the Federal Rules of Civil Procedure, is entitled to and seeks a preliminary injunction and permanent injunction directing defendants, their agents, servants, employees and attorneys, and all others in active concert or participation with them, to be enjoined or directed as follows.

**96.**

DLI seeks preliminary and permanent injunctions requiring Offord:

    a.  To return all property belonging to DLI which is in Offord's possession and prohibiting Offord from engaging in any further use of DLI's property or interference in DLI's business;

    b.  To cease using and to immediately return any of the assets of DLI in defendants' possession or control;

30

c.  To return to DLI all proprietary, confidential or trade secrets in defendants' possession, custody or control, including without limitation all customer and vendor lists, records, files, processes;

d.  To promptly return to DLI all proprietary, confidential or trade secrets in defendants' possession, custody or control, including without limitation all customer and vendor lists, records, files, processes;

e.  To refrain from any disparagement of DLI, its employees, equipment, sales channels or any other aspect of the company; and

f.  To immediately turn over to DLI all books and records of DLI;

g.  To immediately transfer all emails and other communications received by the Offord.Me server to or from DLI or its employees following Offord's termination of their access to the Cryptomining.tools domain and website.

h.  To promptly return to DLI all funds received in connection with the upcoming trade conference and provide a full accounting of all registrants and funds received and expended;

i.  To immediately cease and desist from accessing DLI private and confidential information and accounts including, without limitation, DLI's google drive account;

j.  To immediately cease and desist from posting or otherwise making public, private and confidential information of DLI.

k.  To immediately cease and desist from contacting and threatening employees of DLI.

**97.**

In the event that DLI is not found to be entitled to rescission of the agreements then, in the alternative, DLI seeks preliminary and permanent injunctions requiring Offord to abide by the terms of the agreements, including preliminary injunctions requiring Offord:

a. To immediately transfer to DLI administrative control of the Cryptomining.tools domain and website;

b. To immediately transfer administrative control of the Telegram Groups to DLI, along with all emails to or from DLI or its employees following;

c. To immediately cease using, advertising or displaying the brand name cryptomining.tools;

d. To immediately deliver to DLI all Assets sold by NGN/Offord to DLI by that Asset Purchase Agreement dated Dec. 3, 2020, and all related and subsidiary companies presently in their possession;

e. To cease using and to immediately return any of the assets of NGN in defendants' possession or control;

f. To immediately cease and desist from all competition with DLI;

g. To refrain from any disparagement of DLI, its employees, equipment, sales channels or any other aspect of the company;

h. To immediately turn over to DLI all books and records of DLI;

i. To immediately transfer all emails and other communications received by the Offord.Me server to or from DLI or its employees following Offord's termination of their access to the Cryptomining.tools domain and website; and

j. To promptly return to DLI all funds received in connection with the upcoming trade conference and provide a full accounting of all registrants and funds received and expended.

**98.**

DLI requires a preliminary injunction to protect it from irreparable injury to preserve the status quo until the district court renders a meaningful decision on the merits. Plaintiff has shown herein and will show at the time of trial that: (1) it has a substantial likelihood for success on the merits; (2) that it will suffer irreparable harm if the relief is not granted; (3) that the threatened injury to DLI outweighs any potential harm to the non-movant; and, (4) that the relief will not disserve the public interest.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, DLI, Inc., requests judgment, issuance of citations, summons and process as requested herein on Defendants, Scott Offord, New Green Network, LLC and Milwaukee SEO, LLC and that after due proceedings there be judgment in favor of Plaintiff, DLI, Inc and against Defendants, Scott Offord, New Green Network, LLC and Milwaukee SEO, LLC as follows:

1. A declaratory judgment:

(i)     Declaring that DLI is entitled to rescission of the Asset Purchase Agreement and declaring this contract to be rescinded (Exhibit 1);

    (ii)   Declaring that the stock share agreements (Exhibit 3 and Exhibit 4) are not, and never have been, in effect as legally enforceable agreements;

    (iii)   Alternatively, if this Honorable Court determines that the stock share agreements (Exhibits 3 and 4) became legally effective, then DLI requests that this Honorable Court declare that DLI is entitled to rescission of these contracts and declaring the contracts to be rescinded;

    (iv)   Finally, DLI asks this Honorable Court to declare that Offord is not, and never has been, an owner of DLI stock and Offord is not entitled to be recognized as a stockholder or exercise the rights of a stockholder.

2. Rescission of the Asset Purchase Agreement (Exhibit 1) and rescission of the share agreements (Exhibits 3 and 4) if these agreements ever went into effect;

3. An award of damages sufficient to compensate DLI for the injuries complained of herein including damages for unjust enrichment, with interest on any amounts awarded computed according to law;

4. An award of exemplary damages in an amount to be determined based on the evidence with interest on any amount awarded computed according to law;

5. An award of reasonable attorney fees to be fixed by this Honorable Court with interest on any amount awarded computed according to law;

6. An award of all costs of court with interest on any amount awarded computed according to law.

7. Preliminary and permanent injunctions as prayed for above.

(i) To immediately transfer to DLI administrative control of the Cryptomining.tools domain and website;

(ii) To immediately transfer administrative control of the Telegram Groups to DLI, along with all emails to or from DLI or its employees.

(iii) All such other and further relief to which it may be entitled.

Respectfully Submitted,

 /s/ Dennis D. Green, Jr.
**Dennis D. Green, Jr., Esq.**
**LAW OFFICE OF**
**DENNIS D. GREEN, JR., P.C.**
132741 P.O. Box
Spring, Texas 77393
Alabama Bar No. 7616-U22C
dennis@lawofficeofdennisgreen.com
(470) 774-1288

**R. Joshua Koch, Jr.**
**KOCH & SCHMIDT, LLC**
650 Poydras St., Suite 2660
New Orleans, LA 70130
jkoch@kochschmidt.com
(504) 208-9040
*Admitted pro hac vice*

***Attorneys for Plaintiff Distributed Ledger Inc.***