# DISTRIBUTED LEDGER, INC.

## CLASS A COMMON STOCK SHARE AGREEMENT

This Agreement is made as of this 1st day of December, 2020 (the "Agreement Date") between Distributed Ledger, Inc., a Texas corporation (the "Corporation" or "DLI"), and Milwaukee SEO, LLC (the "Shareholder").

## SECTION 1
## AUTHORIZATION AND SALE OF SHARES

**1.1 Authorization.** The Corporation has authorized the transfer to Shareholder 100,000 shares of its Class A Common Stock. The stock is voting, $0.01 par stock having noncumulative dividends, and other privileges as set forth in the Certificate of Formation, Bylaws, and Resolution authorizing issuance of Class A Common Stock, is made part hereof and is incorporated by this reference.

**1.2 Sale of Shares.** Subject to the terms and conditions hereof, the Corporation will issue and transfer to the Shareholder 100,000 shares of the Class A Common Stock (the "Shares") at a for the consideration of Shareholder's business acumen and other such skills and talents that Shareholder will render to DLI.

**1.3 Use of Proceeds.** The net proceeds from the transfer of the Shares shall be used for the purpose of the Corporation's ultimate goal, to build purposeful applications and to utilize Blockchain technologies, which exhibit tremendous purpose and potential, for maximum profit. The Corporation will be focused around crypto-technology, Blockchain, DAG technology, research and development, and building systems utilizing these technologies.

## SECTION 2
## CLOSING DATE; DELIVERY

**2.1 Closing of Shares.** The closing of the transfer of the Shares under this Agreement (the "Closing") shall be held at a time an manner as mutually agreed by the parties for the purchase of the Shares at the offices of Distributed Ledger, Inc. ("DLI"), or at such other time and place as the Corporation and the Shareholder may agree.

**2.2 Delivery.** At each of the Closings under this Agreement, subject to the terms and conditions hereof, the Corporation, if requested, shall deliver to the Shareholder a certificate representing the Shares in exchange for the services and consultation of Shareholder as a voting shareholder of DLI.

EXHIBIT 3

## SECTION 3
## REPRESENTATIONS AND WARRANTIES OF THE CORPORATION

The Corporation represents and warrants to the Shareholder as follows:

**3.1 Organization and Standing.** The Corporation is duly organized, validly existing, and in good standing under the laws of the State of Texas. The Corporation has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as presently conducted and as proposed to be conducted. The Corporation has furnished the Shareholder with certified copies of its Certificate of Formation and Bylaws as of the Agreement Date. Said copies are true, correct and complete, contain all amendments through the Closing Date, and are attached hereto as Exhibits 1 and are hereby incorporated into this Agreement by reference.

**3.2 Corporate Power.** The Corporation has all requisite legal and corporate power to execute and deliver this Agreement, to sell and issue the Shares hereunder, and to carry out and perform its obligations under the terms of this Agreement.

**3.3 Capitalization.** The authorized capital stock of the Corporation as of the Agreement Date consists of 25,000,000 shares as follows:

(i)  5,000,000 shares of Class A Common Stock, with $0.01 par value; and

(ii) 20,000,000 shares of Class B Common Stock, with a $1.00 par value.

**3.4 Financial Statements.** The financial information, if requested by the Shareholder, shall be submitted to the Shareholder in connection with obtaining this financing, was prepared in good faith and fairly represents the financial condition of the Corporation. Such information adheres to sound accounting practices applied in accordance with the past practices of the Corporation.

**3.5 Authorization.** All corporate action on the part of the Corporation, its officers, directors, and shareholders necessary for the authorization, execution, delivery, and performance by the Corporation of this Agreement, the authorization, issuance, sale, and delivery of the Shares and the performance of all of the Corporation's obligations hereunder has been taken or will be taken prior to the Closing. This Agreement, when executed and delivered by the Corporation, shall constitute a valid and legally binding obligation of the Corporation enforceable in accordance with its respective terms, subject to laws of general application relating to bankruptcy, insolvency, and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies. The Shares, when issued in compliance with the provisions of this Agreement, will be validly issued and non-assessable, and will have the rights, preferences, and privileges described in this document; and the Shares will be free of any liens or encumbrances; *provided*, *however*, that the Shares may be subject to restrictions on transfer under applicable securities laws.

**3.6 Title to Properties and Assets.**  The Corporation has good and marketable title to its properties and assets, and has good title to all its leasehold interests, in each case subject to no mortgage, pledge, lien, lease, loan, encumbrance or charge, except those existing of record as of this the date of closing. With respect to any property it leases, the Corporation is in compliance with such leases in all material respects.

**3.7 Compliance with Other Instruments.**  The Corporation is not in violation of any term of its Articles of Incorporation or Bylaws, any material contract, agreement, mortgage, indebtedness, indenture, instrument, judgment, decree, order, or, to its knowledge, any statute rule or regulation applicable to the Corporation. The execution, delivery, and performance of and compliance with this Agreement have not resulted and will not result in any such violation, or be in conflict with or constitute a default under any such term, or result in the creation of any lien, mortgage, pledge, encumbrance or charge upon any of the properties or assets of the Corporation; and there is no such violation or default which materially or adversely affects the Corporation's business or any of its properties or assets.

**3.8 Litigation.**  There are no actions, suits, proceedings or investigations pending against the Corporation, or any of its properties, before any court or governmental agency (nor, to the Corporation's knowledge, is there any reasonable basis therefor or threat thereof). The Corporation is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or governmental agency or instrumentality. There is no action, suit, proceeding or investigation by the Corporation currently pending or that the Corporation intends to initiate.

**3.9 Tax Returns.**  The Corporation will file, has filed, or obtained extensions for all federal, state, and other tax returns which are required to be filed and has paid all taxes which have become due and payable.

**3.10 Insurance.**  The Corporation does maintain insurance policies in such types and amounts as are appropriate for its business and furnish evidence of such insurance to Shareholder upon written request.

**3.11 Governmental Consents.**  No consent, approval, or authorization of or designation, declaration, or filing with any governmental authority on the part of the Corporation is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Shares, or the consummation of any other transaction contemplated hereby, except (i) qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Shares under applicable securities laws and (ii) filing an Amendment to the Certificate of Formation with the Secretary of State of the State of Texas with respect to the Shares.

**3.12 Securities Law Exemption.**  Subject to the accuracy of the Shareholder's representations in Section 4 of this Agreement, the offer, sale, and issuance of the Shares constitute transactions exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "Act"), and are exempt from registration and qualification under the registration, permit or qualification requirements of all applicable state securities laws.

**3.13 Disclosure.**  None of the representations or warranties made by the Corporation in this Agreement and no information in the exhibits hereto, or otherwise furnished to the Shareholder, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading.

**3.14 Brokerage.** The Corporation has not retained any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement.

**3.15 Prompt Payment of Taxes and Claims.**  The Corporation shall pay when due all taxes, lawful claims for labor, materials, supplies, and rents and other debts and liabilities which if unpaid would by law be a lien or charge upon the property of the Corporation unless the Corporation in good faith on contests the payment.

## SECTION 4
## REPRESENTATIONS AND WARRANTIES OF THE SHAREHOLDER

The Shareholder hereby represents and warrants to the Corporation as follows:

**4.1 Authorization.**  All action on the part of the Shareholder necessary for the purchase of the Shares and the authorization, execution, delivery, and performance by the Shareholder of its obligations under this Agreement has been taken or will be taken prior to the Closing. This Agreement when executed and delivered by the Shareholder will constitute a valid and legally binding obligation of the Shareholder, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting enforcement of creditors' rights.

**4.2 Investment.** The Shareholder is acquiring the Shares for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof. The Shareholder understands that the Shares have not been and will not be, registered under the Act by reason of a specific exemption from the registration provisions of the Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Shareholder's representations as expressed herein.

**4.3 No Public Market.**  The Shareholder understands that no public market now exists for any of the securities issued by the Corporation and that the Corporation has made no assurances that a public market will ever exist for the Corporation's securities.

**4.4 Access to Data.**  The Shareholder has had an opportunity to discuss the Corporation's business, management, and financial affairs with the Corporation's management and has also had an opportunity to ask questions of the Corporation's officers, which questions were answered to its satisfaction. The Shareholder has received and relied upon information supplied by the Corporation as a part of the Shareholder's due diligence investigation.

**4.5 Brokers or Finders.**  The Shareholder has not engaged any brokers, finders or agents and has not incurred, and will not incur, directly or indirectly, any liability for brokerage or finder's fee or agents' commissions or any similar charges in connection with this Agreement and the transactions contemplated hereby.

SECTION 5
**CONDITIONS TO SHAREHOLDER'S OBLIGATIONS AT THE CLOSING**

The Shareholder's obligations to purchase the Shares at the Closing under this Agreement are subject to the fulfillment on or prior to the Closing Date of the following conditions, any of which may be waived in whole or in part by the Shareholder:

**5.1 Certain Pre-closing and Closing Documents**

**5.1.1 Digital Certificate for Shares.**  The Corporation at its sole cost and expense shall have delivered to Shareholder a digital certificate evidencing Shareholder's ownership of the Shares, purchased by the Shareholder pursuant to the terms hereof duly executed by the Corporation.

**5.1.2 Officer's Certificate of the Corporation.** The Corporation at its sole cost and expense shall have delivered to Shareholder a certificate of the CEO, President, Vice-President, or Secretary of the Corporation, dated the Closing Date, certifying to the best of its knowledge (a) that all representations and warranties of the Corporation set forth in Article 3 hereof are true and correct as of the Closing Date and (b) the number of shares of capital stock issued and outstanding as of the Closing Date.

**5.1.3** A Certificate of Good Standing from the Secretary of State of Texas, if so requested by the Shareholder.

**5.2 Representation and Warranties True; Performance of Obligations.**  The representations and warranties made by the Corporation in Section 3 hereof shall be true and correct in all material respects on the Closing Date with the same force and effect as if they had been made on and as of such date.

**5.3 Covenants.**  All covenants, agreements, and conditions contained in this Agreement to be performed by the Corporation on or prior to the Closing Date shall have been performed or complied with in all material respects.

**5.4 Consents.**  The Corporation shall have obtained all consents, permits, and waivers necessary to consummate the transactions contemplated by this Agreement.

**5.5 Compliance With Laws.** The purchase of the Shares by the Shareholder hereunder shall be legally permitted by all laws and regulations to which the Shareholder or the Corporation are subject.

## SECTION 6
## CONDITIONS TO CORPORATION'S OBLIGATIONS AT THE CLOSING

The Corporation's obligation to sell and issue the Shares at the Closing is subject to the fulfillment to the Corporation's satisfaction on or prior to the Closing Date of the following conditions, any of which may be waived in whole or in part by the Corporation:

**6.1 Representations and Warranties True; Performance of Obligations.**  The representations and warranties made by the Shareholder herein shall be true and correct in all material respects on the Closing Date with the same force and effect as if they had been made on and as of the same date; and the Shareholder shall have performed all obligations and conditions herein required to be performed or observed by it on or prior to the Closing Date and all documents incident thereto shall be satisfactory in form and content to the Corporation and its counsel.

**6.2 Compliance With All Laws.**  At the Closing, the purchase of the Shares by the Shareholder hereunder shall be legally permitted by all laws and regulations to which the Shareholder or the Corporation are subject.

## SECTION 7
## COVENANTS OF THE CORPORATION

**7.1 Inspection.**  The Corporation shall permit the Shareholder at such party's expense, to visit and inspect the Corporation's properties, to examine its books of accounts and records and to discuss the Corporation's affairs, finances, and accounts with its officers, all at such reasonable times as may be requested by the Shareholder; *provided*, *however*, that the Corporation shall not be obligated pursuant to this Section 7.1 to provide access to any information that it reasonably considers to be a trade secret or similar confidential information unless such the Shareholder provides reasonable assurances in writing that it will maintain the confidentiality of the information.

**7.2 Information on Request; Disclosure.**  To the extent required to enable Shareholder to comply with the laws of the State of Texas and at Shareholder's cost, the Corporation shall furnish promptly, at Shareholder's request, such information as may be reasonably necessary to enable Shareholder to determine whether the Corporation is in compliance with the terms of this Agreement or as may be required by Shareholder to prepare its annual report. The Corporation consents to reasonable disclosure by Shareholder as required by Texas Law of the Corporation's

financial information in connection with the preparation of Shareholder's annual report; provided, however, that prior to making any such disclosure Shareholder shall give the Corporation thirty (30) days written notice.

**7.3 Corporate Existence.** The Corporation shall cause to be done all things necessary to maintain and preserve its corporate existence and rights, and shall comply with all related laws applicable to the Corporation.

**7.4 Material Litigation.** The Corporation shall notify Shareholder of all material litigation and of all proceedings before any governmental or regulatory body to which it is a party and which may affect its business.

**7.5 Termination of Covenants.** The covenants set forth in this Section 7 shall terminate and be of no further force or effect when the Shareholder ceases to hold its Shares.

**7.6 Notice of Default.** The Corporation shall provide the Shareholder with notice of any default by the Corporation under any loan agreement or promissory note of the Corporation.

**7.7 Delivery of Annual Financial Statements and Other Information.** The Corporation shall deliver to each holder of Shares, ("Interested Holder"):

(a) as soon as practicable, but in any event within ninety (90) days after the end of each fiscal year of the Corporation, beginning with FY 2018, financial statements as well as the operating statements for such fiscal year and balance sheets of the Corporation as of the end of such year, such financial statements to be prepared in accordance with sound accounting practices consistent with the past practices of the Corporation and reviewed by a certified public accountant selected by the Corporation;

(b) as soon as practicable, but in any event prior to the end of each fiscal year of the Corporation, beginning with FY2018, annual projections for the coming year for the FY2019 and FY2020 operations as well as combined operations of the Corporation; and

(c) such other information relating to the financial condition, business, prospects or corporate affairs of the Corporation as any Interested Holder may from time to time reasonably request; <u>provided</u>, <u>however</u>, that the Corporation shall not be obligated to provide information that it deems in good faith to be proprietary or confidential unless the Interested Holder provides reasonable assurances in writing that it will maintain the confidentiality of the information.

**7.8 Delivery of Quarterly Financial Statements; Tax Returns; Quarterly Reports.**

The Corporation, if requested, shall deliver to each Interested Holder:

(a) within thirty (30) days after the end of each quarter commencing with the 2nd quarter of 2018, unaudited operating statements, balance sheets and cash flows for and as of the end of such period and for the year to date;

(b) complete copies of the Corporation's state and federal income tax returns, including all schedules and attachments, within thirty (30) days of the date of filing; and

(c) within thirty (30) days of the end of each quarter commencing with the 3rd quarter of 2018, an aging of accounts receivable and accounts payable including separate reports for 4th quarter 2018 and 1st quarter 2019 and a combined report.

**7.9 Binding Effect.** The Corporation expressly reserves the right to delegate or assign its duties, obligations, claims, or rights of this Agreement as it sees fit, without the consent of any party or third-party beneficiary of this Agreement.

## SECTION 8
## Buy-Sell Agreement Terms and Conditions

### Article I.  Purposes

**8.1 Protective Purpose of Agreement.**  The purpose of this Agreement is to protect the Corporation's management and control from persons not acceptable to all shareholders. The other purpose is to provide a ready market in the event of the death, disability or lifetime transfer of shares by a Shareholder.

### Article II.  Enforcement

**8.2 Restriction on Transfer** To accomplish the purposes of this Agreement, any transfer, sale, assignment of any of the shares of the Corporation, other than according to the terms of this Agreement, is void.  Each Shareholder shall have the right to vote shares held of record and to receive dividends paid on them until the shares are sold or transferred in accordance with this Agreement.

**8.3 Legend on Share Certificates.** Each share certificate whether presently owned or subsequently acquired, shall have the following statement conspicuously printed on its face or contained in a digital format:

> "The transfer, sale, assignment of the shares represented by this certificate is restricted by a Buy-Sell Agreement among all the Shareholders and the Corporation dated 12/01/2020. A copy of the Buy-Sell Agreement is available for inspection during normal business hours at the principal office of the Corporation.  All the terms and provisions of the Buy-Sell Agreement are incorporated by this reference and made a part of this certificate."

### Article III.  Voluntary Lifetime Transfer of Shares

**8.4 Permitted Transfers.**  Each Shareholder has the right to transfer shares to another shareholder. A permitted transferee shall hold the transferred shares subject to all the provisions of this Agreement.

**8.5 Notice of Proposed Sale.**  Any Shareholder wishing to sell his/her shares shall provide a Notice of Proposed Sale.  The notice must specify:

- the name and address of each proposed transferee
- the number of shares or the interest in shares to be transferred
- the price per share
- the terms of the proposed sale, assignment, or transfer.

**8.6 Purchase by Remaining Shareholders.**  The Remaining Shareholders have the right, but not the obligation, to purchase the offered shares at the price determined by Article 9 of this Agreement.  Within 30 days of notification of the Proposed Sale, any Shareholder who chooses shall notify the Secretary of the Corporation of his/her election to purchase a specified number of the offered shares.

**8.7 Excessive Offers to Purchase.**  If the Remaining Shareholders elect to purchase shares in excess of the amount offered, the available shares shall be allocated according to the same proportion as the existing shares owned by those shareholders.

Within 30 days, the Secretary of the Corporation shall notify the shareholders of the final purchasers of the offered shares.  Each shareholder must meet the terms and conditions of the purchase within ten days after the Shareholder receives the Secretary's notification.

**8.8  Default of Option by Shareholders.**  If the Remaining Shareholders do not purchase all of the shares specified in the Notice of Proposed Sale, the selling shareholder may sell them to the proposed transferee specified in the Notice of Proposed Sale on the terms specified in that notice.  The transferee will hold the shares subject to the provision of this Agreement.  The selling Shareholder may not, however, sell any or all of the offered shares to any other person or firm or at any other price or on any other terms and conditions than those specified in the Notice of Proposed Sale.  Any sale or transfer by any Shareholder in violation of this Section shall be null and void.

**8.9 Obligations of Transferees.**  Unless this Agreement expressly provides otherwise, each transferee and any subsequent transferee of the shares of this Corporation, or of any interest in those shares, shall hold the shares or interest subject to the provisions of this Agreement and shall make no transfers except as provided in this Agreement.  The Secretary of the Corporation shall record these transfers on the books of the Corporation until an amended copy of this Agreement has been executed by the transferee.  The transferee's failure or refusal to sign an amended copy of this Agreement does not relieve the transferee of any obligation or restriction under this Agreement.

### Article IV.  Involuntary Lifetime Transfer of Shares

**8.10 Involuntary Transfer**.  If a Shareholder's shares are transferred involuntarily due to bankruptcy or divorce, 60 days after notice of the event, the other Shareholders shall have the option, but not the obligation to purchase all or some of the shares owned by the Shareholder at the price and the terms provided in this Agreement.  The option shall be exercisable by the

Shareholders, according to the provisions of this Agreement. If the option is not exercised with regard to all of the shares owned by the Shareholder, the Shareholder or the Shareholder's successor in interest will hold the remaining shares subject to this Agreement.

### Article V.  Sale of Shares on Death

**8.11  Purchase by Surviving Shareholders.**  Within 60 days after the death of any Shareholder, the surviving Shareholders shall, at the price and on the terms and conditions specified in this Agreement, purchase from the Decedent's estate all the shares owned by the decedent. The obligation of the surviving Shareholders to the decedent's estate under this Article shall be joint and several. However each surviving Shareholder shall have the right and obligation to purchase the available shares in proportion to his or her existing ownership interests – exclusive of the decedent's shares at the date of the decedent's death.

**8.12  Death of Shareholder's Spouse.**  The death of a Shareholder's spouse who has never been active in or devoted his or her full working time to the business of the Corporation shall not be considered the death of a Shareholder for purposes of this Article.

**8.13  Method of Payment of Purchase Price.**  The purchase price for the decedent's shares shall be paid to the decedent's estate or the decedent's successor in interest in a lump sum. The purchase price of the shares shall be determined in accordance with Article 9.

### Article VI.  Transfer on Total Disability

**8.14  Transfer on Disability of Shareholder.**  If a Shareholder becomes either physically or mentally disabled for a period of 90 days, and a physician's opinion is issued stating that the disability will continue for one year, the Remaining Shareholders shall have the option, but not the obligation to purchase all of the shares of the disabled Shareholder within 90 days of that notice. The price and terms shall be according to Article 3 of this Agreement. If the option is not exercised with regard to all the shares of the disabled Shareholder, the disabled Shareholder - or the Shareholder's successor in interest - shall hold the shares subject to the provisions of this Agreement.

### Article VII.  Transfer on Termination of Employment

**8.15  Termination of Employment.**  If the employment of a Shareholder with the Corporation is terminated for any reason, the Remaining Shareholders shall have the option, but not the obligation, within 90 days after receiving notice of the event, to purchase all of the Class A Common Stock shares and the Shares of the terminated Shareholder at the price and on the terms provided in this Agreement and in the manner described in Article 3. If the option is not exercised with regard to all the shares of the terminated Shareholder, the Shareholder shall hold the shares subject to the provisions of this Agreement.

### Article VIII. Payment for and Transfer of Shares

**8.16  Delivery and Enforcement of Shares.**  The purchaser shall deliver the consideration for the shares as soon as practicable to the selling Shareholder, as well as the endorsed certificates representing the shares for transfer.

**8.17 Transfer of Title.**  On any transfer of shares under this Agreement, title to the shares shall pass from the seller to the purchaser upon payment by the purchaser of the consideration and endorsement of the share certificates by the seller as provided in Section 8.01.  The seller's status as a shareholder thereupon shall cease.

### Article IX: Determination of Purchase Price.

**8.18 Purchase Price set by Appraisal.**  The purchase price of the shares subject to this Agreement shall be the value of the shares set by appraisal.  However, in the event of death of a shareholder, the purchase price shall be no less than the value of the shares as finally determined for federal estate tax purposes.

**8.19 Selection of Appraiser.**  Within 10 days after an event requiring the determination of purchase price, the Corporation and the selling Shareholder shall mutually select a qualified appraiser to appraise the Corporation and set a value on its stock.

**8.20 Binding Nature of Determination.**  The value of the shares computed according to this Article is binding on all persons.

### Article X. Termination of Agreement

**8.21 Events Causing Termination.**  This Agreement shall terminate on any the following:

- The written consent of parties to the Agreement.
- The dissolution, bankruptcy, or insolvency of the Corporation.
- One shareholder becoming the owner of all the shares.

### Article XI.  Calls, Puts, & Other Rights of Redemption

**8.22 Corporation Call.**  The Corporation has the ongoing right to purchase the Shares owned by any Shareholder at any time and from time to time (which right is referred to herein as a "Call"). A Call may be exercised by the Board at any time upon written notice sent to the Shareholder, which notice shall state the Shares to be called and the effective date of the purchase. Upon the exercise of a Call, the Shareholder whose Shares are being called shall sell to the Corporation the number of Shares called as of the effective date determined by the Board and for the purchase price and upon the payment terms provided in this Agreement.

**8.23 Shareholder Put.**  Each Shareholder who is an employee of the Corporation or any of its affiliates, has the right to Put the Shares owned by the Shareholder to the Corporation upon termination of such employment, provided that this Put may only be exercised as to all Shares the

Shareholder owns (directly or upon exercise of a stock option). If the Shareholder is a Living Trust, then this Put shall be effective upon termination of employment of the individual who is the grantor of such trust. A Put must be exercised within 60 days after the effective date of the termination of employment by written notice sent to the secretary of the Corporation. Upon the exercise of a Put, the Corporation shall purchase the Shares owned by that Shareholder for the purchase price and payment terms provided in this Agreement.

**8.23 No Right of Redemption.** There is no right of Redemption of Shares and the Board has the exclusive right to allow Redemption once per quarter as it deems fit, if any. The Board also has the right to amend, extend, or shorten, the lock-up period of Shares by a super majority vote of the Board. Any Shareholder wanting to fully divest of their Shares may petition the Board in writing during any quarter before the redemption period of the following quarter within thirty (30) days advance written notice.

**8.25 Lockup Period.**  The Shareholder is bound by an initial twenty-four (24) month "lockup" period from the date of purchase, transfer, comes into possession of, or controls, any Shares so acquired, notwithstanding termination of employment, in accordance with Section 8.23.

**8.26 Post-Lockup Period.**  After the Lock-Up Period, the Shareholder may redeem only up to forty percent (40%) of the Shares, each quarter, until the remaining amount of Shares held is less than ten percent (10%) of the maximum total amount of Shares the Shareholder has ever owned, after which, the entire outstanding Shares owned by Shareholder may be redeemed the following quarter in accordance with Section 8.23.

## SECTION 9
## Stock Dividend

**9.1 Issuance of Dividend**. The Corporation will meet quarterly to vote on the issuance of dividends. There are no pre-defined dates to declare and pay an annual or quarterly dividend. The Corporation will pay and issue dividends in compliance with its Bylaws.

**9.2 Payment of the Dividend**. Dividends may be distributed in cypto-currency form or US Currency and will be payable five (5) business days after declared by the Corporation. Dividends may be used to acquire more unissued Shares, if any exists at the time of issuance of the Dividend, at the sole discretion of the Shareholder, in any combination or percentage thereof, in compliance of the Bylaws of the Corporation.

## SECTION 10
## S Status

[This Section has been Repealed by Resolution of Shareholders]

## SECTION 11
## Non-Compete & Confidentiality

**11.1 Covenants.** As a material inducement to the parties hereto to enter into this Agreement, the Shareholders hereby covenant and agree as follows:

**11.2 Confidential Information.** During the period that any Shareholder owns Shares, and at all times after he ceases to own Shares, such Shareholder shall not, directly or indirectly, divulge or disclose, for any purpose whatsoever, any confidential information, including without limitation, the Corporation's trade secrets, systems, procedures, manuals, confidential reports, as well as the nature and type of services rendered by the Corporation, the equipment and methods used and preferred by the Corporation, and fees paid by its customers, which has been obtained by or disclosed to him or her as a result of his or her status as a shareholder, officer, director and/or employee of the Corporation; provided, however, such Shareholder shall be permitted to divulge or disclose any financial or other relevant information to the extent reasonably necessary for him to perform his responsibilities and duties as a shareholder, director, employee and/or officer of the Corporation; further, the following information is excluded from the scope of this provision: (i) information that is or becomes a part of the public domain; (ii) information that such Shareholder can reasonably and promptly demonstrate was in the receiving party's possession at the time divulged or disclosed by such Shareholder; (iii) information that is required to be disclosed by law or to comply with a subpoena or court order; (iv) information that is required to be disclosed to the Internal Revenue Service or other taxing authority in connection with an audit; or (v) information necessary to enforce any term or provision of this Agreement.

**11.3 No Competition.** During the period that any Shareholder who owns more than 100,000 Shares, Shareholder shall provide full written disclosure to the Board of any business transactions, or acquisition of stock, bonds, or investments of any company, corporation, entity, partnership, or proprietorship, that promotes, develops, or has as its stream of revenue: Blockchain technologies, distributed ledgers, or otherwise any competition of the Corporation, whether directly or indirectly, and whether as a proprietor, partner, Shareholder, shareholder, director, officer, consultant, independent contractor, coventurer, employer, employee, principal, agent, manager, representative or in any other capacity.

**11.4 No Solicitation.** During the period that any Shareholder owns Shares, and for a period of two (2) years after that Shareholder ceases to own Shares, with respect to the Corporation, such Shareholder shall not, directly or indirectly, solicit business from, divert business from, or perform services for or to, any customer of the Corporation, including any potential customer for which a bid has been or is expected to be submitted by the Corporation.

**11.5 No Hire.** During the period that any Shareholder owns Shares, and for a period of two (2) years after that Shareholder ceases to own Shares, such Shareholder shall not, directly or indirectly, solicit for employment or employ any employee of the Corporation, or any individual who was employed by the Corporation within the one (1) year period preceding purchase of such Shareholder's Shares.

**11.6 Remedies- Injunctive Relief.**  The parties acknowledge that a violation of this non-competition covenant will cause irreparable damage to the Corporation, the exact amount of which may not be subject to reasonable or accurate ascertainment, and therefore the Shareholders hereby consent that in the event of such violation, the Corporation shall as a matter of right be entitled to injunctive relief to restrain them, or any person or entity acting for or on behalf of them, from violating this covenant without the necessity of posting bond. Such remedies, however, shall be cumulative and in addition to any other remedies to which the Corporation may then be entitled.

The Shareholders agree that in the event the Corporation seeks an injunction against them to prevent them from violating these covenants, the time periods will not begin to run until such time as a court or arbitrator grants injunctive relief to the Corporation, and that any time between the date of the inception of the non-compete period and the date injunctive relief is granted will not be credited toward the time period restriction.

The Shareholders represent and acknowledge that their experience and capabilities are such that they can obtain employment in businesses other than a business which competes with the Corporation, and that the enforcement of a remedy by way of injunction will not prevent them from earning a livelihood.

**11.7 Reasonableness of Restrictions.** It is expressly understood and agreed that although the parties consider the restrictions contained herein reasonable as to protected business, duration and geographic area, in the event any court of competent jurisdiction deems them to be unreasonable, then such restriction shall apply to the broadest business, longest period and largest territory as may be considered reasonable by such court, and this Agreement as so amended shall be enforced.

**11.8 Accounting for Profits.**  If there is any breach of the covenants the Corporation shall be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations or benefits that the breaching Shareholder directly or indirectly has realized and/or may realize as a result of, growing out of or in connection with any such violation. Such remedy shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which the Corporation is or may be entitled at law or in equity or under this Agreement, including, for this purpose, the right of the Corporation to withhold any payments due to such Shareholder under any promissory note issued pursuant to any of the provisions of this Agreement.

**11.9 Forfeiture.**  Upon a material breach of any of these covenants, the Corporation may declare forfeited all amounts remaining to be paid to the breaching Shareholder, whether due under this Agreement or otherwise.

### SECTION 12
### Miscellaneous

**12.1 Survival.**  The representations, warranties, covenants, and agreements made herein shall survive any investigation made by the Shareholder and the closing of the transactions contemplated hereby. All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Corporation pursuant hereto or in connection with the transactions

contemplated hereby shall be deemed to be representations and warranties by the Corporation hereunder as of the date of such certificate or instrument.

**12.2 Entire Agreement.** This Agreement, the exhibits, and the other documents delivered pursuant to this Agreement constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants or agreements except as specifically set forth herein or therein. Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto and their respective successors and assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided herein.

**12.3 Severability.** In case any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision; provided, however, that no such severability shall be effective if it materially changes the economic benefit of this Agreement to any party.

**12.4 Amendment and Waiver.** Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Corporation and the Shareholder.

**12.5 Spouses' Interest.** Any community property or other interest that a spouse might have in the Shares is subject to the terms and conditions of this Agreement, and spouse shall have no right to participate in management, including without limitation vote as a shareholder or attend shareholder meetings, and shall have no rights or interest except through the Shareholder. Any right to purchase Shares owned by a Shareholder shall include the right to purchase any interest in any Shares the Shareholder's spouse or former spouse might have. Each Shareholder, by signing this Agreement, represents and warrants to the Corporation that he or she has obtained the valid and legally binding consent of his or her spouse to this Agreement as provided above and that such consent is effective to carry out these provisions, and agrees to indemnify the Corporation from any expenses, damages, losses, claims, liability or adverse affect which may result by reason of a spouse, deceased spouse, or divorced spouse having any rights or interest in the Corporation other than through the Shareholder and in accordance with this Agreement.

**12.6 Waiver of Conflict of Interest.** The Law Office of Dennis D. Green, Jr., P.C. (the "Law Firm") has represented the Corporation in the preparation of this Agreement. Each of the Shareholders acknowledges that he or she: (i) was advised in advance by the Law Firm that a conflict exists among their individual interests, that this Agreement may have tax consequences, and that they are advised to secure separate independent legal counsel in connection with signing and making this Agreement and its effect upon each of them; (ii) has carefully read and understood the provisions of this Agreement; (iii) has had the opportunity to seek the advice of independent legal counsel; (iv) has had the opportunity to request such information and has received such information about the Corporation and the other Shareholders as he or she requested; and (v) is signing and making this Agreement voluntarily.

**12.7 Notice.**  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery, or upon deposit with the United States Post Office, by first-Class mail, return receipt requested, postage addressed as set forth at the bottom of this paragraph, or at such other address as the Corporation shall have furnished to the Shareholder in writing.

To the Corporation as: DLI, 1008 Randall Ave, Daphne, AL 36526

To the Shareholder as:  Tommy Vardell, P.O. Box 526, Alamo CA 94507

and a copy to:  Dennis D. Green, Jr., Esq., 5223 Pointe Spring Xing, Spring, Texas 77389

**12.8 Governing Law.**  This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Texas (without regard to principles of conflicts of law).

**12.9 Choice of Venue**.  Any action, claim, or dispute arising out of, from, or in connection with this Agreement in any manner, shall be litigated in a court of competent jurisdiction in and for Baldwin County, State of Alabama.

**12.10 Attorneys Fees.**  In the event of any dispute arising out of, from or in connection with this Agreement, or suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or dispute and in any appeals. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided.

**12.11 Titles and Subtitles.**  The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

**12.12 Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

**12.13 Not Construed Against Drafter**.  The essential terms and conditions contained in this Agreement have been mutually negotiated between the parties hereto.  No ambiguity in this Agreement shall be construed or interpreted as against the drafter of this Agreement.

**12.14 Digital Version**.  This Agreement may be amended, replaced, replicated, or duplicated with a digital version or a smart contract and will have the same force and effect.

The foregoing Agreement is executed as of the date first above written.

| | |
|---|---|
| **CORPORATION:** | **SHAREHOLDER:** |
| **DISTRIBUTED LEDGER, INC.** | **MILWAUKEE SEO, LLC** |

John Michael Francis II
Chief Executive Officer
Distributed Ledger, Inc.

Scott Offord
Managing Member
Milwaukee SEO, LLC