**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **DISTRIBUTED LEDGER, INC** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NO.: 1-21-CV-490-KD-N** |
| **NEW GREEN NETWORK LLC,** | * | |
| **MILWAUKEE SEO LLC, and SCOTT** | * | |
| **OFFORD** | * | |
| **Defendants.** | * | |

**PLAINTIFF'S OPPOSITION TO DEFENSE'S MOTION TO DISMISS**

MAY IT PLEASE THE COURT:

Defendants, Scott Offord, New Green Network, LLC and Milwaukee SEO, LLC (hereafter collectively "Offord") have filed a 12(b)(6) motion (Rec. Doc. 39) seeking dismissal of all counts of plaintiff's supplemental and amended Complaint except for Count I. Plaintiff, Distributed Ledger, Inc. ("DLI") respectfully submits that this motion is ill founded and should be denied for the following reasons.

## PROCEDURAL HISTORY

Plaintiff filed its original Complaint (Rec. Doc. 1) on or about November 10, 2021. Following a settlement among the parties, an Initial Status Conference, and in the absence of an Answer or other responsive pleading[1], plaintiff filed its Amended, Supplemental and Restated Complaint (hereafter "Complaint") on or about March 3, 2022. (Rec. Doc. 37).

On April 4, 2022, Defendants filed their 12(b)(6) motion to dismiss all but Count I of plaintiff's Complaint which Defendant's concede is sufficient to state a claim for breach of contract.

---

[1] The defense did not challenge the sufficiency respond of the original complaint. Rather, defendants filed only an opposition to plaintiff's request for injunctive relief (Rec. Doc. 16).

## INDEX TO COMPLAINT

Plaintiff summarizes its Complaint as follows:

Allegations of fact. (The allegations of fact are supplemented by additional allegations of fact set forth in certain counts where appropriate.)

Count I – breach of independent contractor agreement

Count II – breach of asset purchase agreement

Count III – violation of Alabama Trade Secrets Act

Count IV – fraud

Count V – defamation

Count VI – petition for declaratory judgment

Count VII – breach of contract – stock share agreements

Count VIII – accounting

Remedies Including Request for Preliminary and Permanent Injunctions

Jury Demand

Prayer for Relief

Exhibit 1 – Asset Purchase Agreement

Exhibit 2 – Independent Contractor Agreement

Exhibit 3 – Class A Common Stock Share Agreement (unsigned)

Exhibit 4 – Class B Common Stock Purchase Agreement (unsigned)

## APPLICABLE LEGAL STANDARD

The applicable 12(b)(6) legal standard is well established and is set forth in numerous cases including the following recent decisions.

*McDowell v. Alabama Dep't of Pub. Health,* 2:20-CV-280-JTA, 2022 WL 988377 (M.D.

Ala. Mar. 31, 2022):

> When evaluating a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1321–22 (11th Cir. 2012). To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly*, 550 U.S. at 556).

*Omni Techs., LLC v. Know Ink, LLC,* CV 20-0175-WS-B, 2020 WL 5239823, at *2 (S.D. Ala.

Sept. 2, 2020):

> To satisfy Rules 8(a) and 12(b)(6), Fed.R.Civ.P., a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[ ] [its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require[ ] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. As the Eleventh Circuit has explained, *Twombly / Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 380 (11th Cir. 2010) (citations omitted). "To survive a 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, ... but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010)(citations and internal quotation marks omitted).

The *Omni* court includes a cautionary statement <u>against</u> requiring more detail than is reasonably

necessary to explain the plaintiff's position:

> … (t)he Complaint *(contains a)* specific allegation that "Omni fulfilled its obligations" under the Contract. On its face, that allegation supports a reasonable inference that Omni performed pursuant to the Contract. Additionally… the Court draws all reasonable inferences in the <u>plaintiff's</u> favor, not the defendant's. *See, e.g., Carruth v. Bentley*, 942

3

F.3d 1047, 1053 (11th Cir. 2019) (in reviewing a Rule 12(b)(6) dismissal, "[w]e accept all facts alleged in the complaint as true and draw all inferences in the plaintiff's favor"). For the reasons already stated, the Complaint plainly supports a reasonable inference that Omni did perform under the Contract; therefore, Omni's pleading of Count 1 is not fatally defective … and dismissal on that basis is inappropriate. *(emphasis in original)*

The parties have only in the past couple of weeks been authorized to commence discovery related the factual claims at issue here. As recognized by the Supreme Court, a claim is facially plausible when it alleges sufficient factual content to permit the reasonable inference that the defendant is liable for unlawful conduct, this giving rise to a "reasonably founded hope that the discovery process will reveal relevant evidence to support the claims." *Twombly*, footnote 8, 550 U.S. at 563.

## ARGUMENT

Plaintiff would show that its Complaint is legally and factually sufficient, as follows:

### COUNT I
### BREACH OF INDEPENDENT CONTRACTOR AGREEMENT[2]

The defense concedes that Count I is sufficient.

### COUNT II
### BREACH OF ASSET PURCHASE AGREEMENT[3]

The defense asserts that Count II is deficient in two respects.[4]

**1. *Defendants' first argument:*** Defendants wrongly allege that plaintiff cannot seek damages for breach of the Asset Purchase Agreement (APA) because the APA requires plaintiff to transfer stock to defendants, plaintiff has not transferred the stock, and the Complaint admits that plaintiff has not transferred the stock.

This is a misreading of the Complaint. The Complaint alleges that plaintiff made good faith attempts to complete the transfer but defendants blocked the transfer by refusing to complete the

---

[2] Complaint, ¶'s 43 – 52, pages 18 – 20.
[3] Complaint, ¶'s 53 – 56, pages 20 – 21.
[4] Defense Memorandum at 4

necessary paperwork. To be precise, the Complaint alleges that the parties entered into an agreement which was documented in four interrelated written contracts (Complaint paragraphs 16 and 17, exhibits 1 through 4). When the four contracts are read together, it is clear that the stock transfer will occur (plaintiff "will issue" the stock) upon execution of the four contracts and on terms specified therein (Exhibit 3 Sections 1 and 2; Exhibit 4 Sections 1 and 2). The Complaint further alleges that the parties executed two of the four contracts (Exhibits 1 and 2); plaintiff tendered the remaining two contracts to defendants (Exhibits 3 and 4); defendants indicated to plaintiff that defendants were satisfied with, and intended to execute, the remaining two contracts; but never did.[5] (complaint paragraphs 18 through 23, 71). Since these agreements specify the date and circumstances on which the stock transfer is to take place, defendants' decision not to execute these two agreements effectively blocked the stock transfer.

The defendants, in an attempt to support their motion to dismiss, argue that the APA's integration clause makes it clear that defendants were entitled to receive the stock immediately upon execution of the APA with no obligation to execute the stock transfer agreements as a precondition for receiving the stock. Defendant's argument is misleading. The APA's integration clause actually reads, in pertinent part, as follows (Exhibit 1 paragraph 7.10 – Entire Agreement):

> This agreement and the exhibits and schedules hereto **and the Related Agreements** constitute the entire agreement and understanding among the parties … *(emphasis added)*

---

[5]  The APA calls for DLI to transfer stock to NGN (Exhibit 1). The complaint alleges that plaintiff prepared stock transfer agreements which identified NGN as the party which would own the stock and submitted these contracts to defendants for execution, defendants responded by indicating that defendants were satisfied with the contracts except for one detail: defendants wanted the stock to be transferred to Milwaukee SEO instead of NGN. Defendants asked plaintiff to revise the contracts to include this one change. Plaintiff revised the contracts to include the change requested by defendants and forwarded the revised contracts to defendants. Defendants did not object to the revised contracts or request any further changes, but defendants did not execute the contracts. Instead, defendants simply remained silent.

See also APA Section 3.2, which calls for execution and delivery of the APA and "**related agreements."**

The APA does not list or identify the "related agreements." The Complaint identifies the stock transfer agreements as two of the four related contracts that the parties agreed to sign (Complaint paragraph 16). Taking the allegations of the Complaint as true, the stock transfer contracts are "Related Agreements" within the meaning of the APA and the defendants must execute the stock transfer agreements as a precondition for receipt of stock. See Exhibit 3 Section 2 and Exhibit 4 Section 2.

In sum, the Complaint alleges facts which support the conclusion that plaintiff fulfilled its obligations under the APA.

There are two final points to note. First, taking the allegations of the Complaint as correct, it may reasonably be inferred that, by expressing approval of the stock transfer agreements without executing the agreements, the defendants acted in bad faith to plaintiff. [6] Second, the legal consequences of defendants' actions are unclear.[7]

---

[6] To be precise, it may reasonably be inferred that the defendants engaged in deceptive behavior by allowing and encouraging plaintiff to believe that the parties were in agreement on the terms of the stock transfer agreements - including the non-compete clauses - when, in fact, the defendants did not intend to execute the stock transfer agreements and the defendants did not intend to abide by the non-compete clauses. It may reasonably be inferred that, at the outset of the parties' relationship, the defendants had already decided to obtain benefits from plaintiff, including the $84,000/month salary and access to inside information about DLI's business, by offering a pretense of agreement and cooperation while secretly planning to compete with plaintiff.

[7] On the one hand, it may reasonably be argued that, since defendants declined to execute the stock transfer contracts, these contracts never became legally effective. On the other hand, it may reasonably be argued that since defendants affirmatively led plaintiff to believe that defendants intended to execute the contracts and since defendants obtained benefits from plaintiff (e.g., the $84,000 a month independent contractor fee) by allowing plaintiff to believe that defendants intended to execute the contracts, it may reasonably be argued that the principles of estoppel and detrimental reliance prohibit defendants from repudiating these contracts. *See* Reeves *Cedarhurst Dev. Corp. v. First Am. Fed. Sav. & Loan Ass'n*, 607 So. 2d 180, 183 (Ala. 1992)(estoppel). In the latter case, does this mean that the contracts became legally effective to the same extent as if executed by the parties? Or does this simply mean that certain of the contract provisions will be given limited effect to the extent necessary to protect plaintiff's rights?

**2.** ***Defendants' second argument:*** Defendants also argue in support of their claim for dismissal of Count II, that plaintiff has not adequately pleaded defendant's breach of the APA (defense memo page 6). This argument is simply incorrect and grossly ignores the many facts pleaded supporting defendant's breaches of the APA.

The Complaint alleges that defendants breached the APA by, inter-alia, declining to sign the stock transfer agreements, despite acknowledging its receipt and having actually requested plaintiff to amend the agreements to substitute Milwaukee SEO for New Green Network which Offord claimed was going out of business. (Complaint paragraphs 21, 22 and 56). This issue has been discussed *infra*.

The Complaint also alleges that defendants breached the APA by failing to deliver assets to Plaintiff as required by the APA (complaint paragraph 55).

Paragraph 1.1 of the APA provides, in pertinent part that:

… the Seller shall sell, assign, transfer and convey to the Buyer …**all of the assets of Seller used in the Business**, including without limitation, those listed below, free and clear of all Liens except Permitted Liens …

The APA specifically identified nine groups of assets making up at least a portion of the assets being sold. While the APA has a reference to "Retained Assets", there is no further mention or identification of other or "retained assets".

The APA does list among the assets being acquired:

1. 50% ownership in a pending trademark for the phrase "Blockchain Mining" …

2. Sponsorship, exhibit booths and tickets to two major 2021 bitcoin/blockchain conferences

Exhibit 2 (the Independent Contractor Agreement) provides for DLI to employ NGN as manager of eight of the nine specific assets listed in the APA. Exhibit 2 paragraph 2. The ninth

asset – the asset which defendants ARE required to deliver and defendants ARE NOT employed to manage - is the "sponsorship, exhibit booths, and tickets" referenced above.

The Complaint goes on to identify a list of non-delivered assets, as follows.

**a. *The 50% interest in the pending trademark for "Blockchain Mining":*** According to the allegations of the Complaint, defendants could not and cannot deliver this asset which NGN contracted to deliver because defendants did not and do not own this item (Complaint paragraph 32f):

> (f) Offord, despite his and NGN's representations … to DLI that NGN was owner of 50% interest in the pending trademark for the phrase "Blockchain Mining", failed and refused to transfer to DLI this 50% interest. On information and belief, this interest was not owned by Offord or NGN and was not theirs to sell.

See also paragraph 55:

> NGN failed to deliver key assets to DLI and, furthermore …NGN did not own some of the assets that NGN promised to deliver."

**b. *The conference sponsorship assets:*** The Complaint clearly alleges that NGN failed to deliver the information, materials, and funds relating to the conferences and, instead, instructed conference participants to pay their registration fees to defendants rather than DLI:

> Complaint paragraph 32a: (Defendants) instructed participants … to pay their registration fees for the conference to the bank account of Milwaukee SEO, LLC rather than DLI.

**c. *Other non-delivered assets:*** The Complaint includes an itemized list of other items which NGN specifically contracted to deliver and which plaintiff alleges NGN failed to deliver. *See* Complaint paragraphs 32b, c, d, e and g, e.g. 32(b) "Offord failed and refused to turn over administrative control of the Telegram groups", 32(c) "despite the sale to DLI of Cryptomining.tools domain and all associated accounts … (*Offord*) failed and refused to surrender these records, information, and administrative control of the domain" etc.

Defendants seek to excuse their breach and non-delivery by arguing that Offord maintained possession and control of the assets because the Independent Contractor Agreement provided for defendants to "manage" the assets. This argument is illusory and misleading, at best.

First, as already pointed out above, the APA calls for delivery of the conference sponsorships. The Independent Contractor Agreement, however, DOES NOT call for defendants to manage these sponsorships. Defendants, therefore, cannot possibly rely on the independent contractor agreement as justification for retaining control of the conference sponsorships.

Second, moving beyond the conference sponsorships to other assets, the independent contractor agreement calls for defendants to manage the assets under the supervision and according to the instructions of DLI. The independent contractor agreement does not authorize defendants to retain sole control of the assets. Thus, there is nothing in the independent contractor agreement which relieves defendants from their obligation to deliver the assets to DLI.  The complaint alleges non-delivery and, for 12(b)(6) purposes, this is sufficient. *See Omni, supra.*

As a final effort to rebut the complaint's allegations of non-delivery, defendants attempt to support their motion to dismiss by going outside the four corners of the complaint and presenting their own allegations of fact which contradict the allegations of the complaint.[8] These claims are irrelevant because, for 12(b)(6) purposes, the allegations of the complaint must be accepted as correct.

Plaintiff has adequately pleaded that defendants breached the contract by refusing to deliver the assets which the APA required defendants to deliver. Count II of the Complaint is sufficient to state a claim.

---

[8] For example, defendants claim that they delivered the telegram groups which were governed by the contract and retained only telegram groups that were outside the scope of the contract (defense memo page 7 paragraph 1).

## COUNT III
## VIOLATION OF ALABAMA TRADE SECRETS ACT[9]
### (Complaint paragraphs 57 through 61, pages 21 through 22)

Defendants argue that plaintiff's Alabama Trade Secrets Act claim is deficient in two respects. According to defendants, plaintiff has not specifically identified and described any item of property which meets the definition of "trade secret" under the Act; and/or plaintiff has not alleged facts sufficient to support the conclusion that defendants "misappropriated" the property within the meaning of the Act.

Plaintiff respond as follows. According to the act, a "trade secret" is information which meets certain criteria. (Ala. Code § 8-27-2):

(1) Trade secret. — A "trade secret" is information that:
a. Is used or intended for use in a trade or business;
b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
d. Cannot be readily ascertained or derived from publicly available information;
e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
f. Has significant economic value.

Misappropriation occurs if a defendant obtains the information through improper means [10], then uses or disseminates the information in a manner prohibited by Alabama Code § 8-27-3(2), which includes "disclos(*ing*) or us(*ing*) the trade secret of another if …that person's disclosure or use constitutes a breach of confidence reposed in that person by the other."

---

[9] Complaint, ¶'s 57 - 61, pages 21 - 22.
[10] The term "improper means" is defined broadly to include, but not be limited to, a specific list of wrongful acts (Ala. Code § 8-27-2):
(2) Improper means. — "Improper means" are means such as:
a. Theft;
b. Bribery;
c. Misrepresentation;
d. Inducement of a breach of confidence;
e. Trespass; or

A review of the Complaint will show that plaintiff has identified three different categories of trade secrets (confidential information) which defendant has misappropriated, as follows.

***Information which the Asset Purchase Agreement requires defendants to deliver to plaintiff:*** The Asset Purchase Agreement requires defendants to deliver several types of information relating to defendants' business to plaintiff. By description and by implication, this information meets the definition of "trade secret." [11] The Complaint asserts that the defendants failed to deliver this information and, instead, sold this information to a third party or retained this information for defendants' sole use and benefit (see above). The Complaint also makes allegations which, if true, support an inference that defendants acted in deliberate bad faith. By example, the Asset Purchase Agreement identifies "PDU design" as information to be transferred pursuant to the agreement. Similarly, the Complaint asserts (complaint paragraph 32(g)) that:

> Offord failed and refused to provide to DLI the design discussions, drawings, and related material for PDU current and future designs, although acknowledging that DLI had acquired these assets in the Asset Purchase Agreement."

The Complaint alleges that, instead of providing the PDU designs to DLI as defendants had contracted to do, defendants transferred the mining PDU's to third parties and induced the third parties to pay defendants, not DLI, for this information. Complaint paragraphs 32(r) and 32(s):

> 32(r) (*Defendants*) Transferred mining PDU's to a personal friend without authorization or approval.
> 32(s) (*Defendants*) Instructed clients of DLI to send payment for the purchase of miners from DLI to the bank account of Milwaukee SEO, LLC rather than DLI.

---

f. Other deliberate acts taken for the specific purpose of gaining access to the information of another by means such as electronic, photographic, telescopic or other aids to enhance normal human perception, where the trade secret owner reasonably should be able to expect privacy.

[11] For example, plaintiff does not specifically allege that the information has economic value – but since plaintiff is willing to pay for the information, it is clear that the information has economic value.  Similarly, plaintiff does not allege that the information is not publicly available – but obviously, if the information is publicly available, plaintiff would not be willing to pay for it.

Similarly, the Complaint at paragraph 32(d) alleges that defendants contracted to supply an export spreadsheet/list of NGN's customer base to DLI but rather migrated this customer/vendor list to a different company owned by defendants, inferentially so that defendants could use this information for its own profitable competing business in violation of its commitments to DLI.

Refusing to deliver trade secrets which one has contracted to deliver and, instead, retaining sole control of these trade secrets and selling them to a third party, or using them for one's own benefit - especially when coupled with evidence of deliberate bad faith - fits readily within the language of the Alabama Trade Secrets Act as a violation of the Act.

The Complaint sets forth multiple additional examples of the same type of behavior.[12] Again, each item of information listed fits readily within the definition of "trade secret". According to the Complaint, the defendants refused to deliver the listed item of information and, instead, retained it for defendants' own use or sold it to a third party.

***Information acquired during the period when defendants acted as DLI's independent contractor:*** The Complaint alleges that, during the time that defendants acted as an independent contractor to DLI, defendants undertook an obligation to act in the best interest of DLI (Complaint paragraphs 28, 30). The Complaint alleges that defendants, by acting as an independent contractor, obtained the opportunity to acquire detailed inside information about DLI's business including

---

[12] The Asset Purchase Agreement identifies "cryptomining tools, website, apps and code base" as assets to be transferred. The complaint asserts (Complaint paragraph 32(c):

(D)espite the sale to DLI of Cryptomining.tools domain and all associated accounts …(*Offord*) failed and refused to surrender these records, information, and administrative control of the domain."

See also complaint paragraphs 32(b) and 32(c):

32(b) "…Offord, despite the sale to DLI of 20,000 subscriber blockchain mining email list and multiple popular Telegram groups, failed and refused to turn over administrative control…"

32(c) "…Offord failed and refused to surrender these records, information, and administrative control of the domain (G-suite, marketing mailer apps, mailing lists, sign up forms, etc.) to DLI converting them to his own use and benefit."

information about customers, employee emails, etc. Complaint paragraphs 24-31. See, e.g., Complaint paragraph 31:

> 31. DLI … began to run most of its sales and marketing efforts through its recently acquired cryptomining tools domain and acquired Telegram channels and groups. Offord, at his insistence as Asset Management Director (for DLI), retained administrative control of the Telegram channels and domain… and continued to require DLI employees to use his personal server… to gain access…

The complaint sets forth numerous additional examples of instances in which, while nominally acting as DLI manager, Offord obtained inside information about DLI's business and used this to enrich defendants at DLI's expense and/or to sabotage DLI's operations at a time when defendants were operating their own business in competition with DLI. [13]

**_Information misappropriated after defendants ceased to act as DLI's manager:_** The Complaint concludes by alleging that, after DLI discovered Offord's wrongful acts and terminated Offord as manager, Offord continued to misappropriate and misuse DLI's confidential information, e.g.

> Complaint paragraph 36(10): "Following his termination, Offord redirected repair services from DLI's channels to another party."

> Complaint paragraph 41: "In or about February, 2022, Offord was discovered to have wrongfully accessed DLI's google drive and stolen proprietary information then used to unlawfully compete against DLI."

---

[13] Complaint paragraph 32(s): Offord gained access to DLI client contact and billing information (a trade secret) and Offord used this information to enrich defendants by directing DLI clients to send money which the clients owed to DLI to defendants instead of DLI.
Complaint paragraphs 32(j) and 32(p): Offord gained inside information about DLI's relationship with a DLI customer, Bitmain, and used this information to sabotage DLI's relationship with Bitmain.
Complaint paragraphs 32t: Offord required DLI to use business email accounts which were on Offord's server, then locked DLI employees out of their own accounts, "thereby interfering with and frustrating their communications with customers, potential customers and vendors to the detriment of DLI and to the benefit of Offord."
Complaint paragraph 32(d): "Offord migrated (DLI's) customer/vendor list to … Milwaukee SEO, LLC…"

The defense position, apparently, is that it is not a violation of the Trade Secrets Act to hack into another's google drive and steal information from the drive in order to operate a competing business. Yet, this is precisely the type of wrongful action which the Act is intended to penalize.

In sum, Count III sets forth a claim for violation of the Alabama Trade Secrets Act.

## COUNT IV
## FRAUD[14]

In Alabama, "fraud" includes intentional, reckless, and even negligent misrepresentations of material fact. Ala. Code 1975, § 6-5-101. The elements of a fraud claim are set forth in

*Billy Barnes Enters. v. Williams*, 982 So. 2d 494, 499 (Ala. 2007) as follows:

> Regardless of whether the representation is made willfully, recklessly, or mistakenly, a plaintiff alleging fraud must prove four elements: (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance.

The defense argues that plaintiff has alleged fraud in general terms but has not given a detailed description of specific misrepresentations which could constitute fraud. This is incorrect. Several examples of apparent misrepresentations by defendant have already been discussed at length hereinabove, including the following.

(1) Defendants induced plaintiff to enter into the APA by inaccurately claiming to own the pending trademark application which defendants did not, in fact, own. This is fraudulent inducement and, if proved, plaintiff is entitled to relief. *See Wells Fargo Bank, N.A. v. Trotman,* 940 F. Supp. 2d 1359, 1364 (M.D. Ala. 2013) (quoting *Oakwood Mobile Homes, Inc. v. Barger,* 773 So. 2d 454, 461 (Ala. 2000).

(2) Defendants deceived plaintiff as to defendants' intention with respect to the stock transfer agreements: defendants informed plaintiff that defendants were satisfied with the stock transfer agreements (including the noncompetition clauses) except for one minor change which plaintiff agreed to, leading plaintiff to believe that defendants intended to execute the agreements and, thereby, leading plaintiff to provide defendants with benefits that plaintiff would not otherwise have provided (e.g., the $84,000/month salary as asset manager). Defendants then engaged in competition with plaintiff and, when defendants'

---

[14] Complaint, ¶'s 62 - 64, pages 22 - 23.

behavior was discovered, defendants repudiated the stock transfer agreements. This constitutes fraud. *See*: *Billy Barnes, supra.*

In Paragraph 36(4), the Complaint adds that, while defendants acted as manager under the independent contractor agreement, defendants "provided false and misleading material information to the Company's CEO and COO to disguise his actions."

The above allegations are sufficient to set forth a cause of action for fraud.

**COUNT V**
**DEFAMATION[15]**

A defamation claim may be pled generally; heightened pleading requirements do not apply to a defamation claim. *Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* 619 F.Supp.2d 1260, 1284 (M.D. Fla.2009), aff'd, 451 Fed.Appx. 862 (11th Cir.2012). To pass muster under Rule 8(a), a defamation claim must set forth the allegedly defamatory statement and generally describe the manner and to whom it was uttered. *Tolar v. Cummings*, No. 2:13-cv-0132-JEO, 2014 U.S. Dist. LEXIS 111448, at *63 (N.D. Ala. Mar. 31, 2014).

Here, the Complaint at paragraph 66 states that defendants, before and after being terminated as manager, "falsely communicated to DLI customers, vendors, and others in the Crypto Industry that DLI's new sale channels were 'fake' as well as other allegations designed solely to harm DLI for his own benefit."

This allegation is sufficient under *Pierson, supra* and *Tolar, supra. See Caster v. Hennessey,* 781 F.2d 1569, 1570 (11th Cir.1986), a case which predates *Iqbal* and *Twombly* but which is cited as authoritative in *Pierson*:

(T)he complaint reproduced the allegedly defamatory statement and generally described its publication, stating it was communicated to personnel within the defendant hospital

---

[15] Complaint, ¶'s 65 - 67, page 23.

and prospective employers. This statement of appellant's claim was sufficient to give the defendants fair notice of his claim and the basis therefore.

Defendants argue that the Complaint is insufficient because the allegations are made "on information and belief" and, in defendants' eyes, this phrase is "conclusory." Plaintiff would respond that all allegations of fact contained in any complaint are, necessarily, based on either the plaintiff's direct knowledge or, alternatively, on information provided to plaintiff by third parties. When a plaintiff makes allegations of fact based on information provided to plaintiff by third parties, it is a common pleading practice to characterize the allegations as "made on information and belief." The use of this phrase simply characterizes the source of the information and has nothing to do with whether the allegations are, or are not, sufficiently specific to meet the requirements of Fed.R.Civ.Pro. 8.

Defendants' second argument is that plaintiffs have failed to provide information concerning the date and time of the defamatory conversation, etc. This is simply an attempt to impose a heightened pleading requirement on defamation claims. The federal courts have however, consistently rejected such attempts. *Pierson, supra.*

Plaintiff has sufficiently stated a claim for defamation.

### COUNT VI
### PETITION FOR DECLARATORY JUDGMENT AND RESCISSION[16]

Plaintiff seeks a declaratory judgment holding that defendants never became owners of DLI stock.[17] Plaintiff reasons that defendants never acquired ownership of DLI stock because

---

[16] Complaint, ¶'s 68 - 79, pages 23 - 27.

[17] Plaintiff explains that, in plaintiff's view, Offord did not become a stockholder because Offord did not deliver the assets identified in the Asset Purchase Agreement as consideration for the stock (complaint paragraph 70) and/or because Offord did not sign and return the stock transfer agreements (complaint paragraph 71). Plaintiff explains that Offord, disagreeing with plaintiff, takes the position that Offord does own the stock (complaint paragraph 72). Plaintiff asks this Honorable Court to resolve this dispute by rendering a declaratory judgment holding that Offord does not own the stock.

defendants failed to deliver the assets specified in the APA and/or because defendants failed to execute the stock transfer agreements. In the alternative, if this Honorable Court concludes that the stock transfer agreements went into effect, plaintiff seeks rescission of these agreements (Complaint paragraph 79). Plaintiff also seeks rescission of the APA.

Defendants assert that there is no justiciable controversy because defendants complied with the APA and defendants were not required to sign the stock share agreements. This argument is specious and ignores defendant's refusal to transfer the assets under the APA, defendant's sale of an asset they did not own, and defendant's failure and subsequent refusal to execute the stock share agreements. Defendants have acknowledged that they were aware of and had been provided these agreements but for reasons unknown[18], refused to sign them. These agreements were clearly related to the APA.

Second, defendants dispute that the issue of stock ownership is governed by Texas law (Complaint paragraphs 74 et seq.). This position ignores the fact that DLI is a Texas corporation and that the stock share agreements clearly provide for the application of Texas law.

Pretermitting a discussion of this choice of law issue and as a practical matter, there does not appear to be any material difference between Alabama and Texas law. Both states follow the "internal affairs" doctrine which provides that issues relating to a corporation's internal affairs are governed by the state of incorporation. Tex.Business Organizations Code 1.101; *Euroboor B.V. v. Grafova,* No. 2:17-cv-02157-KOB, 2021 U.S. Dist. LEXIS 182157 (N.D. Ala. Sep. 23, 2021); *Ex parte Bentley,* 50 So. 3d 1063, 1070 (Ala. 2010):

> "In Alabama, the law of the state of incorporation governs the internal corporate relationship. *Massey v. Disc Mfg., Inc*., 601 So. 2d 449 (Ala. 1992).

---

[18] The stock sale agreements included a non-compete which was presumably a basis for defendant's refusal.

Both states follow the rule that, if consideration for stock is not paid, then ownership of the stock is not transferred. Tex.Business Organizations Code 21.157; *Oden v. King*, 216 Ala. 504, 508, 113 So. 609, 611 (Ala. 1927). Thus, as far as plaintiff can determine, under either state's law, the outcome is the same: if DLI establishes that defendants did not pay the consideration called for by the parties' agreements, then defendants did not obtain an ownership interest in the stock.

To the extent the APA's choice of law provision purports to contract for an outcome which is contrary to both Texas and Alabama law (and, specifically, to the extent that the APA purports to contract for application of Alabama law to the internal affairs of a Texas corporation), it appears that the APA's choice of law provision is unenforceable because it is contrary to positive law and inconsistent with the public policies of both states.

Defendants also argue that plaintiff has not pleaded any claim which could justify rescission as a remedy, because rescission is an equitable remedy and "plaintiff alleges no facts to show that breach of contract damages would not adequately compensate it for its losses" (defense memorandum page 15). This is a misstatement of the law, whether Texas or Alabama law is deemed applicable. *See: Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530 (Tex. App. 2007) (held: specific performance, an equitable remedy, is available to resolve dispute over ownership of stock in a closely held corporation because of difficulty in establishing the fair market value of the stock); *Oden v. King,* 216 Ala. 504, 508, 113 So. 609, 611 (Ala. 1927) (seller seeks injunction against transfer of stock, arguing that buyer is not entitled to transfer because buyer failed to pay consideration; held: injunctive relief, an equitable remedy, is available to maintain status quo while court resolves dispute over stock ownership; court discusses the issue at length, citing extensive authority for the proposition that a court of equity will grant an equitable remedy "where necessary

to prevent the transfer of a specific thing – including stock – which if transferred, will be irretrievably lost to the owner").

In sum, plaintiff has stated claims for both declaratory relief and rescission of the Asset Purchase Agreement and for rescission of the stock share agreements, if these agreements were ever in effect.

## COUNT VII
## BREACH OF CONTRACT – STOCK SHARE AGREEMENTS[19]

The facts as alleged in the Complaint are consistent with any three possible legal conclusions:  1) the stock transfer agreements never went into effect because defendants never executed the agreements; or, 2) the stock transfer agreements went into effect because defendants signified their approval of these agreements even though defendants did not execute the agreements;   or, 3) the stock transfer agreements became effective in part, with specific clauses of these agreements being enforceable insofar as necessary to protect plaintiff's rights under the circumstances.[20]

In sum, the mere fact that defendants did not execute the agreements does not automatically lead to the conclusion that plaintiff cannot seek damages for breach of the agreements. *See Reeves Cedarhurst Dev. Corp. v. First Am. Fed. Sav. & Loan Ass'n*, 607 So. 2d 180, 183 (Ala. 1992) (estoppel).

A plaintiff may properly set forth mutually inconsistent legal theories in the alternative and may properly seek different types of relief on the alternative. Therefore, plaintiff may properly

---

[19]Complaint, ¶'s 80 - 81, page 27.
[20] Defendants quibble over the use of the phrase "stock transfer agreements" and insist that the only correct way to refer to Exhibits 3 and 4 is as "Shareholder Agreements." In fact, exhibit 3 is titled "Class A Common Stock Share Agreement," exhibit 4 is titled "Class B Common Stock Purchase Agreement", and both agreements call for transfer of stock at a mutually convenient closing date, upon terms set forth in the agreements. Therefore, the generic term "stock transfer agreement" is as good a term as any to describe these agreements.

plead a claim for breach of the stock transfer agreements, in the alternative, even though plaintiff questions whether the stock transfer agreements ever became legally effective.

**COUNT VIII**
**ACCOUNTING[21]**

The Complaint alleges that defendants were paid to manage a significant part of plaintiff's business; that defendants were placed in charge of plaintiff's assets including eight of the nine assets identified in the APA, as well as additional assets already owned by plaintiffs; that defendants were placed in contact with plaintiff's customers and were authorized to negotiate contracts on DLI's behalf; and that defendants were given inside information concerning plaintiff's business. The Complaint further alleges that defendants used their position to undercut plaintiff's business and set up competing businesses. Finally, the complaint asserts that defendants using their position as manager to engage in conversion of plaintiffs' funds and assets (the conference registration fees, the PDU designs and payments therefore). The Complaint prays for an accounting.

Defendants argue that plaintiff is not entitled to an accounting, because – according to defendants – accounting is an equitable remedy and plaintiff has not alleged facts which would support the conclusion that money damages are inadequate; and, more specifically, because plaintiff has not pleaded facts which support the conclusion that the case meets any of the three criteria for an equitable accounting set forth in *Whitman v. Mashburn*, 286 Ala. 209, 238 (Ala. 1970) (an accounting is an appropriate remedy when accounts are mutual and/or when accounts are difficult and complicated to adjust making money damages an inadequate remedy and/or when there is a fiduciary relationship between the parties.)

---

[21] Complaint, ¶'s 82 - 85, pages 27 - 28.

In response, plaintiff will show the following.

To begin with, defendant is in error in characterizing an accounting as an exclusively equitable remedy. In fact, the courts have recognized that an accounting may be prayed for at common law or in equity. Tilley's *Alabama Equity* § 24:1 (5th ed.) (June 2021 Update):

§ 24:1. Introduction to the remedy of accounting

A common-law action for accounting exists against one who is under a legal duty to account for the money or property of another. When this or another legal remedy is inadequate, a complainant historically has been allowed to file a bill for an equitable accounting.

Corpus Juris Secundum explains a plaintiff's right to a common law accounting as follows (Corpus Juris Accounting Section 1, footnotes omitted, emphasis added):

**The action of account is a common-law action to compel persons who are under a legal duty to account for money or property of another to render an account. The action is civil in nature and is based on an express or implied contract where the failure of the breaching party to account leaves the injured party unable to calculate the money owed under the contract**. Thus, a legal accounting may be an appropriate step in determining the amount of damages in a breach of contract action …

In our case, if the allegations of the Complaint are correct, plaintiff is entitled to a "legal" (aka common law) accounting because, due to defendants' deceptive behavior and self-dealing, plaintiff is unable to calculate the money owed to plaintiff under the parties' contracts. *See also Dewberry v. Bank of Standing Rock,* 227 Ala. 484; 150 So. 463 (1933) (the court notes that an accounting is always available when pleaded as incidental to another substantive claim and an accounting is available where the defendant has engaged in deceptive behavior.)

Additionally and alternatively, if the allegations of the complaint are correct, plaintiff is also entitled to an equitable accounting. To be precise, an equitable accounting is available where there is a fiduciary relationship and/or where the parties' transactions are so complex that the amount due cannot readily be calculated.

With respect to the existence vel non of a fiduciary relationship, a review of the Independent Contractor Agreement will show that, under the terms of this agreement, defendants undertook strict duties of loyalty and confidentiality. See, e.g., Exhibit 2 paragraph 7. The terms of the agreement clearly created a principal-agent relationship. As An agent has a fiduciary duty to the principal, a duty of "utmost good faith and loyalty." *Bay Shore Props. v. Drew Corp.*, 565 So. 2d 32, 34 (Ala. 1990):

> The law is well settled in Alabama and other jurisdictions that an agent owes his principal a fiduciary duty and therefore must act in the utmost good faith and must make known to his principal all material facts within his knowledge that in any way affect the transaction and the subject matter of the agency.

*See also Williams v. Williams*, 497 So. 2d 481 (Ala. 1986). Thus, plaintiff is entitled to an equitable accounting because of the existence of a fiduciary duty.

Additionally or alternatively, taking the allegations of the complaint as correct, our case is suitable for an equitable accounting because of the number and complexity of the transactions involved and because it will be necessary to investigate and unravel a large number of transactions including transactions which involve deception and/or self-dealing. *See Dewberry, supra* (accounting where there has been deception); *Hall v. McKeller*, 155 Ala. 508, 510, 46 So. 460, 461 (1908) (held: when an agent handles a single, simple transaction, the principal is not entitled to an accounting; but when an agent undertakes to manage the principal's business affairs resulting in multiple transactions over a period of time, then the principal has the right to seek an accounting in equity.)

Finally, plaintiff would note that the 11th Circuit rejected an argument presented under Florida law but analogous to defendants' in *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301 (11th Cir.2014). In *Zaki Kulaibee,* a diversity case in which the court applied Florida law which appears to be indistinguishable from Alabama law, the plaintiff employed defendants to act

as consignees for plaintiff, to sell numerous items for plaintiff on commission and remit the proceeds of the sales less fees and expenses. The 11th Circuit held that the district court erred in failing to order an accounting because the parties' relationship was sufficiently one of confidence to qualify as a fiduciary relationship and/or because the transactions were complicated and defendants had engaged in deceptive or obstructionist behavior making it difficult to calculate plaintiff's damages.

## **CONCLUSION**

For all of the above and foregoing reasons, the motion to dismiss under 12(b)(6) should be denied. Alternatively, if this Honorable Court concludes that any of defendants' challenges to the complaint are meritorious, plaintiff would ask for leave to amend the Complaint to plead facts in more detail in order to eliminate any deficiency. See *Eiber Radiology, Inc. v. Toshiba America Medical Systems, Inc*., 15-14334 (11th Cir. 12/20/16), 673 Fed.Appx. 925 (when a 12b6 motion identifies deficiencies which can arguably be remedied by the filing of an amended complaint with more detailed fact pleading, then the plaintiff will ordinarily be given leave to amend.)

Respectfully Submitted,

**LAW OFFICE OF
DENNIS D. GREEN, JR., P.C.**

 */s/ Dennis D. Green, Jr.*
Dennis D. Green, Jr., Esq.
Alabama Bar No. 7616-U22C
dennis@lawofficeofdennisgreen.com
132741 P.O. Box
Spring, Texas 77393
(470) 774-1288

**KOCH & SCHMIDT, LLC**

R. Joshua Koch, Jr.
650 Poydras St., Suite 2660
New Orleans, LA 70130
jkoch@kochschmidt.com

(504) 208-9040
*Admitted pro hac vice*

**Attorneys for Plaintiff Distributed Ledger Inc.**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 2 day of May, 2022, electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Caroline T. Pryor
Sarah Cross Ryan
CARR, ALLISON
6251 Monroe St., Suite 200
Daphne, AL 36526

Gary Zhao
Joseph Carlasare
SMITH AMUNDSEN LLC
150 North Michigan Ave, Suite 3300
Chicago, IL 60601

*/s/ R. Joshua Koch, Jr.*
**R. Joshua Koch, Jr., Esq.**